IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

_____

PERSPECTIVES THERAPY
SERVICES, LLC, a Michigan Limited
Liability Company, and TIANNA
HOPPE-ROONEY, an individual
           Plaintiffs,

-vs-

BEHAVIORAL HEALTH PRACTICE
SERVICES, LLC, a Delaware Limited
Liability Company, and LIFESTANCE
HEALTH, INC, a Delaware Profit
Corporation,

           Defendants.

Case No.  2:23-cv-11663
Hon.

Cooper & Riesterer PLC
7900 Grand River
Brighton, MI 48114
810.227.3103

## COMPLAINT

There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.

NOW COMES Plaintiffs, PERSPECTIVES THERAPY SERVICES, LLC (hereinafter, "**Perspectives**"), and TIANNA HOPPE-ROONEY (hereinafter, "**Hoppe-Rooney**"), by and through their attorneys, Cooper & Riesterer, PLC, and for their Complaint against BEHAVIORAL HEALTH PRACTICE SERVICES, LLC and LIFESTANCE HEALTH, INC., state as follows:

## OVERVIEW

1.    This matter involves breach of contract and related claims arising out of the purchase by Defendants of the assets of Perspectives Therapy Services, a five-location mental health services provider which closed in 2022.

2.     Specifically, this action alleges the failure by Defendants to honor a material term of the Asset Purchase Agreement which required an incentive payment in the amount of three million dollars ($3,000,000) if certain post-closing targets were achieved by Plaintiffs as sellers in that transaction.

3.     Plaintiffs have met the post-closing targets set in the Agreement and Defendants have refused to pay Plaintiffs the funds to which they are entitled.

## PARTIES, JURISDICTION, AND VENUE

4.     Plaintiff Tianna Hoppe-Rooney is an individual who resides at 4863 Aljoann, Brighton, Michigan, 48116, was the sole member and owner of Perspectives Therapy Services, LLC, and is a party to the Asset Purchase Agreement that is at center of this case.

5.     Hoppe-Rooney is also the resident agent of Plaintiff Perspectives.

6.     Plaintiff Perspectives Therapy Services, LLC is a Michigan limited liability company with a registered address of 4863 Aljoann, Brighton, Michigan 48116.

7.     Defendant Behavioral Health Practice Services, LLC is a Delaware limited liability company authorized to do business in Michigan as a foreign entity through its resident agent.

8.     This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1332 on the basis that all Plaintiffs in this case are citizens of different states than all Defendants and the amount in controversy exceeds $75,000.

9.     Furthermore, given that this Court has original jurisdiction to hear this action, this Court has supplemental jurisdiction to hear all other related claims, including claims that allege violations of Michigan state law, pursuant to 28 U.S.C § 1367(a).

10.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2).

Cooper & Riesterer PLC
7900 Grand River
Brighton, MI 48114

810.227.3103

**BACKGROUND**

11.     Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

*Perspectives Therapy Services, LLC*

12.     Perspectives Therapy Services was the D/B/A name under which Tianna Hoppe-Rooney provided clinical services to clients since 2004.

13.     Subsequently, Perspectives Therapy Services was incorporated as a domestic limited liability company on January 26, 2009, by its sole owner, Tianna Hoppe-Rooney, LMFT.

14.     Since its inception, Perspectives has provided mental health services to the community it serves through individual, couple, and family talk therapy.

15.     While Perspectives initially started with two offices, in Brighton, Michigan and Lansing, Michigan, over the 18 years since its inception, Hoppe-Rooney grew Perspectives into a thriving clinic with five service locations in Michigan located in the cities of Fenton, Highland, Lansing, Brighton, and New Hudson providing vital mental health services to thousands of clients.

16.     In addition to its physical clinical locations, Perspectives also provides remote services to clients via video conference technology.

17.     Hoppe-Rooney's husband, Todd Rooney (hereinafter "**Rooney**"), who acted in an operational support role within the business as Financial Director, was also instrumental to the company's impressive growth.

18.     During most of her time at Perspectives, Hoppe-Rooney served as Operations Director or a similar managerial role for the business and at all times maintained an active clinical license.

Cooper & Riesterer PLC
7900 Grand River
Brighton, MI  48114

810.227.3103

**Cooper & Riesterer PLC**
7900 Grand River
Brighton, MI  48114

810.227.3103

***Perspectives' Acquisition by LifeStance Health***

19.     In 2021, Hoppe-Rooney was approached by a company called LifeStance Health regarding a potential purchase of the successful business she and her husband had grown in Michigan.

20.     Hoppe-Rooney was not actively seeking to the sell the practice at the time she was first contacted, but eventually agreed in November of 2021 to meet with a LifeStance representative named Stephen Dickey to discuss a possible acquisition of her business.

21.     LifeStance Health, Inc. was incorporated in Delaware in 2015.

22.     Though headquartered in the state of Washington, according to its website, LifeStance also has locations in Arizona, California, Colorado, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Kansas, Kentucky, Maine, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Nevada, New Hampshire, New Jersey, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Utah, and Virginia.

23.     Upon information and belief, LifeStance grew to its current size primarily through acquisition of existing successful mental health services clinics in the various states where it does business, like Perspectives.

24.     Ultimately, after a multiple-month negotiation period, Perspectives and Hoppe-Rooney entered into a certain Asset Purchase Agreement, with a Closing Date, and effective date, of March 1, 2022. *See **Exhibit A*** (hereinafter, the "**Agreement**").

25.     The Agreement was executed on behalf of the purchaser by its agent, Ryan Pardo, Chief Legal Officer of LifeStance.

26.     Another entity, Perspectives Legacy, LLC (hereinafter "**Legacy**") was a party to the Agreement for the purposes of allocating a portion of the purchase price under the Agreement to a charitable purpose.

27.     The amount of the purchase price allocated to Legacy is held for investment and will be used for future planned charitable giving.

28.     For reasons that are known to LifeStance, the Agreement was structured such that Defendant Behavioral Health Practice Services, LLC, an affiliate of LifeStance also incorporated in the state of Delaware, was the purchaser in the Agreement.

29.     That Agreement contains a choice of venue/forum selection provision at Section 15.3, selecting the state of Wisconsin as the venue for any disputes involving the Agreement.

30.     Upon information and belief, this choice of venue provision is void and unenforceable.

31.     At the time of execution of the Agreement, LifeStance and Behavioral Health represented that did not conduct business in the State of Wisconsin and had no ties there.

32.     That representation was made so that Plaintiffs would rely on it in agreeing to make the State of Wisconsin as a choice of venue.

33.     Plaintiffs did in fact rely on them in agreeing to the choice of venue term in the Agreement.

34.     Upon information and belief, under the laws of the state of Wisconsin, the Wisconsin state and federal courts do not have personal jurisdiction over the parties in this case and, upon information and belief, would refuse to exercise jurisdiction in the state of Wisconsin.

Cooper & Riesterer PLC
7900 Grand River
Brighton, MI 48114

810.227.3103

Cooper & Riesterer PLC
7900 Grand River
Brighton, MI 48114

810.227.3103

35.     Certain other agreements, defined in the Agreement as the Transaction Documents, were also required to be signed and delivered by Sellers at closing. *See Exhibit A*, Agreement, Section 3.5.

36.     Among these was a certain Provider Employment Agreement ("**Employment Agreement**") between Hoppe-Rooney and LifeStance, see attached ***Exhibit B***.

37.     This Employment Agreement called for Hoppe-Rooney to continue with LifeStance as an employee of the company post-closing in the role of Operations Director and specifically to provide clinical services to patients.

38.     In addition, Hoppe-Rooney, as the selling owner of Perspectives was required to execute a certain Interim Services Agreement to provide transition services to LifeStance. *See **Exhibit C***, Interim Services Agreement.

39.      The Agreement also required that Todd Rooney remain as an employee post-closing to continue in his role with the company; he signed an employment agreement to this effect on February 28, 2022. *See **Exhibit D***, Rooney Employment Agreement.

40.     In this role, he provided assistance in the transition related to financial matters, as well as integrating Perspectives' processes with those utilized by LifeStance and advising employees on transition related benefit and other employment matters.

### *Post-Closing Incentive Payment*

41.     The Agreement set forth a purchase price for Perspectives' assets and other agreements and obligations set forth in the Agreement. *See Exhibit A*, Section 3.1.

42.     Part of the Purchase Price was a certain Contingent Payment, in the amount of $3,000,000, payable to Hoppe-Rooney "following the delivery of documentation that [Perspective Therapy Services] employs the number of "FTE" (full-time equivalent)

clinicians" during the one-year period following the Closing Date equal to "the number of FTE clinicians employed by [Perspectives] on the Closing Date (the "Baseline FTE")." *See Exhibit A*, Section 3.2

43.     Schedule 3 set the Baseline FTE at 45.687, which was measured for the time period from 10/3/2021 through 2/26/2022.

44.     Section 3.2 required that the FTE total for the "Anniversary Period" (from 10/2/2022 through 2/25/2023 be at least 45.687.

45.     After the Closing of the Asset Purchase contemplated by the Agreement, there were two addendums to the Agreement.

46.     The First Addendum had the effect of correcting the Agreement to expand the types of services that count towards the FTE calculation. *See Exhibit A*, First Addendum.

47.     The Second Addendum had the effect of again correcting the Agreement it to conform it to agreed terms. *See Exhibit A*, Second Addendum.

48.     Anniversary FTE was calculated by Plaintiffs as 48.364, which is equal to 106% of the Baseline FTE.

49.     Accordingly, under the terms of Section 3.2 of the Agreement, Plaintiffs have achieved the requisite performance targets necessary to entitle them to the payment of the Contingent Payment.

50.     Notably, the true Anniversary FTE is likely higher than 48.364 because clinical sessions performed during the Anniversary Period and would count toward the Anniversary FTE total continued to be entered into the Electronic Medical Records ("EMR") system beyond the end of the Anniversary Period.

Cooper & Riesterer PLC
7900 Grand River
Brighton, MI  48114

810.227.3103

Cooper & Riesterer PLC
7900 Grand River
Brighton, MI  48114

810.227.3103

51.     Upon information and belief, the data would not be complete until approximately two to three months after the end of the anniversary period.

52.     Plaintiffs no longer have access to the EMR system to be able to provide an updated Anniversary FTE; Plaintiffs have requested that Defendants provide this information multiple times and Defendants refuse to provide the information requested.

53.     Plaintiffs presented Defendants with the data establishing that the Contingent Payment criteria had been met.

54.     In response to Plaintiffs' presented data, Defendants made several inflammatory and false statements attacking the character of Hoppe-Rooney, as well as making specious grounds for refusing to pay.

55.     When Plaintiffs sought a detailed explanation of why Defendants were refusing to provide the required payment, Defendants provided reasons why they did not agree with Plaintiffs numbers that are not required by, and thus violate, the Agreement executed by the parties.

56.     Defendants have, to date, refused to pay the Contingent Payment, which is now past due.

57.     Subsequently, Plaintiffs have repeatedly requested, directly and through undersigned counsel, detailed support for their refusal to pay the Contingent Payment.

58.     Defendants have refused to provide this and are clearly acting in bad faith.

59.     Pursuant to the Agreement, in addition to the Contingent Payment, Defendants also must fully release to Hoppe-Rooney a final payment installment of the purchase price under the Agreement, currently in escrow, of $2,250,000 by September of 2023.

**COUNT I**
**BREACH OF CONTRACT (AGAINST ALL DEFENDANTS)**

60.     Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

61.     The Agreement Section 3 regarding payment of the Contingent Payment constituted a contractual obligation between Behavioral Health and LifeStance as purchasers to pay the full purchase price, including the Contingent Payment in exchange for the fulfilment of the obligations therein by Perspectives and/or Hoppe-Rooney and Rooney.

62.     Perspectives, Hoppe-Rooney, and Rooney have fulfilled their obligations under the Agreement.

63.     Specifically, Perspectives and/or Hoppe-Rooney have achieved an anniversary FTE that is at least 106% of the number required to qualify for the Contingent Payment of $3,000,000.

64.     In failing to timely pay to Hoppe-Rooney the Contingent Payment upon notice that Hoppe-Rooney was entitled to it, Defendants materially breached the Agreement.

65.     As a proximate result of that breach, Plaintiffs suffered damages.

66.     Further, the Agreement requires that the prevailing party in any litigation "to enforce the terms and conditions of this Agreement" be entitled to attorney fees and costs. *See Exhibit A*, Section 18, p. 16.

67.     Accordingly, should Plaintiffs prevail in this litigation, they are also entitled to payment from Defendants of attorney fees and costs of bringing this litigation to enforce the Agreement.

Cooper & Riesterer PLC
7900 Grand River
Brighton, MI 48114

810.227.3103

## COUNT II
## <u>UNJUST ENRICHMENT (AGAINST ALL DEFENDANTS)</u>

68. Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

69. The Defendants received a benefit from Plaintiffs in the form of the assets of Perspectives business and in performing the pre- and post-closing actions required under Agreement and the various incorporated Transaction Documents.

70. Inequity would result to Plaintiffs if Defendants were permitted to retain these benefits without fully compensating Plaintiffs for them.

## COUNT III
## <u>PROMISSORY ESTOPPEL (AGAINST ALL DEFENDANTS)</u>

71. Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

72. Defendants made a promise to Plaintiffs that, in exchange for Plaintiffs meeting certain performance targets they would pay the Contingent Payment of $3,000,000.

73. Defendants' promise to Plaintiffs was clear, definite, and unequivocal and was specifically made to induce Plaintiffs to render the contemplated services the above-described period for Defendants' benefit.

74. Defendants should have reasonably expected that their promise would induce action of a definite and substantial character on the part of Plaintiffs.

75. Specifically, Defendants should have reasonably expected that Plaintiffs should do what they did, which was to achieve the benchmark required by Defendants' promise of at least 100% of the Baseline FTE.

Cooper & Riesterer PLC
7900 Grand River
Brighton, MI  48114

810.227.3103

76.     In fact, Plaintiffs did rely on the Defendants' promise significantly, evidenced by the facts set forth above, including their achieving an Anniversary FTE of at least 106% of the Baseline FTE benchmark.

77.     However, despite Plaintiffs' repeated requests and demands, Defendants have refused to pay Plaintiffs the agreed-upon payment for the services rendered.

78.     Defendants promise must be enforced if injustice is to be avoided.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

A. Issue an order in favor of Plaintiffs and against Defendants, jointly and severally, for damages in the amount of $3,000,000, plus interest, and other compensatory damages;

B. Issue an order in favor of Plaintiffs and against Defendants, jointly and severally, requiring Defendants to pay to Plaintiffs an amount equal to Plaintiffs' attorney fees and costs incurred in bringing this litigation; and,

C. Award any such additional relief as this Court deems just and proper.

Respectfully submitted,
**COOPER & RIESTERER, PLC**

Dated: 7/11/2023

*/s/ Jennifer L. Gross*
Jennifer L. Gross (P76584)
Attorneys for Plaintiff
7900 Grand River Road
Brighton, MI  48114-7332
(810) 227-3103
*jennifer@crlaw.biz*

Cooper & Riesterer PLC
7900 Grand River
Brighton, MI  48114

810.227.3103

# EXHIBIT A

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT ("Purchase Agreement") is dated and effective March 1, 2022 (the "Closing Date") by and between Behavioral Health Practice Services LLC, a Delaware limited liability company, (the "Purchaser") and Perspectives Therapy Services LLC d/b/a Perspectives Therapy Services, a Michigan limited liability company ("Company"), Perspectives Legacy, LLC, a Nevada limited liability company ("Legacy," collectively with "Company," the "Seller") and, Tianna Hoppe-Rooney being the sole member of Company (the "Shareholder").

WHEREAS, Seller owns and operates a behavioral and mental health practice located in Michigan currently consisting of five (5) total locations consisting and operated under the name Perspectives Therapy Services, LLC d/b/a Perspectives Therapy Services (collectively, the "Business");

WHEREAS, Legacy is the owner of the Personal Goodwill associated with Shareholder's operation of the Business;

WHEREAS, Seller desires to sell to the Purchaser, and the Purchaser desires to purchase from the Seller certain of the Seller's assets (exclusive of the Excluded Assets) used by Seller in its operation of the Business, in consideration of the payments by Purchaser described herein and upon the terms and conditions set forth in this Purchase Agreement.

NOW, THEREFORE, in consideration of the mutual covenants, representations, warranties and agreements contained herein, the receipt and sufficiency of which are hereby acknowledged, the parties intending to be legally bound hereby agree as follows:

1.  SALE OF ASSETS.

    1.1.  <u>Sale of Assets to Purchaser</u>.  Subject to the terms and conditions of this Purchase Agreement and for the consideration hereinafter set forth, Seller hereby agrees to sell and transfer to Purchaser, and Purchaser agrees to purchase from Seller on the Closing Date, all of the non-clinical assets used in the Business, including but not limited to, those assets set forth on <u>Schedule 1</u> hereto, wherever located, free and clear of all claims, mortgages, liens, charges, security interests, leasehold interests or encumbrances of any nature whatsoever, except as otherwise expressly provided herein hereto, wherever located, free and clear of all claims, mortgages, liens, charges, security interests, leasehold interests or encumbrances of any nature whatsoever, except as otherwise expressly provided herein.  All of the foregoing, together with any related goodwill and rights of the Seller of every kind, nature and description relating to the operation of the Business, are hereinafter referred to collectively as the "Purchased Assets."

2.  <u>EXCLUDED ASSETS</u>.

    2.1.  <u>Excluded Assets</u>.  Notwithstanding anything in Section 1 to the contrary, the Purchased Assets shall not include any assets specified on <u>Schedule 2</u> hereto.  Further, for purposes of the representations, warranties and covenants and obligations in Sections 6, 8 and 9, the Excluded Assets other than those set forth in Schedule 2 shall be treated as Purchased Assets.

3.  <u>PURCHASE PRICE</u>.

    3.1.  <u>Purchase Price</u>.  In consideration of the assignment, transfer, conveyance and delivery of the Purchased Assets by Seller to Purchaser and of the other agreements of Seller and the Shareholder contained herein, the Purchaser shall pay the purchase price in the amount of up to $25,500,000

(the "Purchase Price") to Seller consisting of (i) a payment of $5,900,000 to Legacy payable on the Closing Date, plus (ii) a payment of $14,350,000 payable on the Closing Date less the Closing Cash Amount to Shareholder (collectively, the "Initial Payment"), plus (iii) a payment in the amount of $2,250,000 to be paid to the escrow agent under that certain Escrow Agreement entered into on even date herewith to be released to Shareholder eighteen months after the Closing Date subject to any claims under this Agreement (the "Escrow Amount") plus (iv) Contingent Payments in accordance with Section 3.2 of up to $3,000,000 in the aggregate.

3.2.    Contingent Payment.  The Shareholder may receive an additional cash payment of up to $3,000,000 in the aggregate (the "Contingent Payments") following the delivery of documentation that the Business employs the number of "FTE" (full-time equivalent) clinicians as set forth below relative to the number of FTE clinicians employed by the Business on the Closing Date (the "Baseline FTE"), set forth in Schedule 3 hereto. An FTE will be defined as a clinician who completes an average of 30 or more clinical sessions per week. The average weekly clinical sessions for each clinician will be calculated by summing the total number of allowed clinical sessions completed during the following window and dividing by the number of weeks. The allowed clinical sessions include the following CPT codes: 90791, 90832, 90834, 90837, 90839, 90846, and 90847. The Baseline FTE time window shall be the time span from 10/3/2021 through 2/26/2022.  Any clinician working with fewer than 30 clinical sessions will be treated as a partial FTE measured as follows: the actual sessions shall be the numerator divided by 30 sessions and will be counted as a proportional fraction of an FTE, i.e., a clinician that completes 15 clinical sessions will be counted as 0.50 FTE, a clinician that completes 7.5 clinical sessions per week will be counted as 0.25 FTE, etc. For the avoidance of doubt an FTE cannot be greater than 1.0.

(1)    First Contingent Payment.  If, for the window from 10/2/2022 through 2/25/2023 (the "First Anniversary"), the Business employs FTE clinicians representing at least 100% of the Baseline FTEs, the Shareholder shall receive a payment in the amount of $3,000,000 payable within forty-five days after such date.

3.3.    Allocation of Purchase Price.  The parties agree that the Purchase Price, as that term is defined in Section 3.1, constitutes, for federal and state income tax purposes, the total consideration furnished by Purchaser for the Purchased Assets.  The Purchaser Price shall be allocated as set forth in Schedule 4. The Purchaser shall determine the amounts of the allocation of purchase price based on Schedule 4 and file such allocation on Form 8594, subject to Seller's review.  None of the parties shall take any position on any income tax return or before any governmental agency charged with the collection of any tax, or in any judicial proceeding relating hereto, that is in any way inconsistent with the allocation of the Purchase Payment.

3.4.    Referrals.  No part of the Purchase Price is a payment to the Seller for the recommending or arranging for the referral of business or the ordering of items or services offered by Purchaser, nor is the Purchase Price intended to induce referrals of business to Purchaser.  All parties hereto acknowledge and agree that Seller does not have any obligation (and there are no representations, implied or otherwise) to refer business to, or otherwise utilize the services or facilities, the Purchaser or any of its affiliates.

3.5.    Transaction Documents.  On the Closing Date, the Seller, Shareholder, and Purchaser shall also execute and deliver, as applicable (collectively with this Purchase Agreement, the "Transaction Documents"):

DocuSign Envelope ID: 60843BA5-39B5-4393-9263-8E5112B7C75B

(1)     Employment Agreements. (i) Employment Agreement between Tianna Hoppe-Rooney and Purchaser, or its affiliate, in form and substance satisfactory to Purchaser, attached hereto as **Exhibit 1;** (ii) Employment Agreement between Todd Rooney and Purchaser in form and substance satisfactory to Purchaser, attached hereto as **Exhibit 2**, and (iii) employment agreements with each of the clinical employees and Purchaser's Michigan affiliated practice, attached hereto as **Exhibit 3**.

(2)     Interim Services Agreement.  Company and Purchaser shall enter into an interim services agreement attached hereto as **Exhibit 4**.

(3)     Business Associate Agreement. Company and Purchaser shall enter into a Business Associate Agreement governing to treatment and disclosures of Protected Health Information ("PHI") made as part of the transaction contemplated by this Purchase Agreement, attached hereto as **Exhibit 5**.

(4)     Escrow Agreement. The Escrow Agreement referred to above in Section 3.1 of this Agreement and attached hereto as **Exhibit 6**.

(5)     Consents and Assignments. Seller will deliver to Purchaser all governmental and third-party consents, if any, necessary for the consummation of the transactions contemplated by this Agreement and the Transaction Documents and for the transfer to Purchaser of the Purchased Assets free and clear of all liens, and provide assignments of the rights to receive the Purchase Price to Shareholder.

(6)     General. Seller and the Shareholder will deliver to Purchaser duly executed copies of such other affidavits, officers' certificates, closing certificates, incumbency certificates and other customary closing documents as Purchaser may reasonably request in connection with the transactions contemplated by this Agreement.

4.     ASSUMPTION OF LIABILITIES.

4.1.     Liabilities Assumed.  The Purchaser and the Seller agree that, effective on the Closing Date, Seller shall assign, and the Purchaser shall assume Seller's liabilities under the Assigned Contracts relating to periods on and after the Closing Date (the "Assumed Liabilities"), listed on Schedule 5, hereto.

4.2.     Liabilities Not Assumed.  Notwithstanding anything in this Purchase Agreement to the contrary, other than the Assumed Liabilities set forth in Section 4.1, Purchaser will not assume or perform any liabilities or obligations or bear any costs, expenses, fines, taxes or other amounts of any nature of Seller of any kind, whether disclosed or undisclosed, arising from, or related to the period, before the Closing Date, whether accrued or unaccrued, known or unknown, absolute, fixed or contingent or otherwise, including but not limited to the Excluded Items (the "Excluded Liabilities.")  Consistent with the foregoing, Shareholder shall remain responsible for any and all liabilities, including but not limited to, any costs, fines, legal fees or settlements, fines, taxes, or other obligations or any nature accrued before the Closing Date pertaining to pre-Closing Date activities of Seller or accruing after the Closing Date but pertaining to pre-Closing Date activities of Seller.

5.     CLOSING.  The closing hereunder shall take place at 12:01 am PT on the Closing Date. On the Closing Date, Seller agrees to take all action as may be reasonably necessary to put Purchaser in possession and operating control of the Purchased Assets, free and clear of all liens or other restrictions or

encumbrances, except as otherwise provided herein, including the obtaining of such consents of third parties as may be reasonably necessary to effect the foregoing. At any time and from time to time after the Closing Date, at the reasonable request of Purchaser and without further consideration, Seller will execute and deliver such other instruments of sale, transfer, conveyance, assignment and confirmation and take such other action as Purchaser may reasonably determine is necessary to transfer, convey and assign to Purchaser and to confirm the title to or interest in the Purchased Assets of Purchaser as set forth in Section 1.1 hereof, to put Purchaser in actual possession and operating control of the Purchased Assets and to assist Purchaser in exercising all rights thereto to which Purchaser is entitled pursuant to this Purchase Agreement.

6.      REPRESENTATIONS AND WARRANTIES OF THE SELLER.  Each of Seller and Shareholder, jointly and severally, represents and warrants to Purchaser that the statements contained in this Section 6 are correct and complete as of the Closing Date:

6.1.      Corporate Status of Seller.  Company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Michigan. Legacy is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Nevada. Company has all requisite power and authority and holds all material Permits that are necessary to enable it to own, lease or otherwise hold the Purchased Assets and to carry on the Business as operated by Company.

6.2.      Ownership of the Company.  The ownership of the Company is set forth on Schedule 6 hereto ("Ownership Interests").  There are no outstanding or authorized (i) options, warrants, purchase rights, subscription rights, conversion rights, exchange rights, rights of first refusal, preemptive rights, or other contracts or commitments that require the Seller to issue, sell, or otherwise cause to become outstanding any of its capital stock, or (ii) interest appreciation, phantom interest, profit participation or similar rights with respect to the Seller.

6.3.      Authority for Agreements.  Seller has the full legal right, power and authority to execute, deliver and perform this Purchase Agreement and to carry out all transactions contemplated hereby, and this Purchase Agreement constitutes a valid and binding obligation of Seller, as applicable, enforceable in accordance with its terms.  All necessary corporate actions will have been taken, prior to the Closing Date, by Seller to authorize the execution hereof and as of the Closing Date will be taken to authorize consummation of the transaction contemplated hereby and the execution and delivery of this Purchase Agreement.

6.4.      Financial Statements. Company has provided to Purchaser the following financial statements of the Business, (a) financial statements as of and for the years ended December 31, 2021, December 31, 2020 and December 31, 2019, (b) monthly production by provider reports for each of the 18 complete calendar months prior to the Closing Date. The foregoing financial statements of the Business are referred to herein as the "Financial Statements." All of the Financial Statements have been prepared from the books and records of the Business (which are complete and correct) and fairly present the financial condition and activities of the Business as of their respective dates and the results of its operations for the periods covered thereby in accordance with reasonable accounting practices consistently applied. The income statements and production reports included in the Financial Statements do not contain any items of special or nonrecurring income or any other income not earned in the ordinary course of business. The income statements include all expenses of the Business that, in accordance with GAAP, should be expensed instead of capitalized.  The books of account and other financial records of Company, all of which have been provided to Purchaser, are complete and correct and represent actual, bona fide transactions and have been maintained in accordance with sound business practices.  The Business does not have any liabilities, obligations or undertakings of any nature whatsoever, whether fixed or contingent, known or unknown, accrued or unaccrued, due or to become due, liquidated or unliquidated, incurred or consequential,

- 4 -

DocuSign Envelope ID: 60842BA5-39B5-4393-9353-8E5112B7C758

determined or determinable, or otherwise, and whether or not required under GAAP to be accrued on financial statements (including any liabilities, obligations or undertakings arising from the use or ownership of the Assets on or prior to the Closing Date ("Liabilities") except for (a) liabilities set forth on the face of the balance sheet of the Business included in the Financial Statements and dated as of the Balance Sheet Date and (b) current trade payables incurred in the ordinary course of business since the Balance Sheet Date (none of which results from, arises out of, relates to, is in the nature of, or was caused by any breach of contract, breach of warranty, tort, infringement, action or violation of any Legal Requirement or order of any governmental authority)..

6.5.     Employees.  To Seller's Knowledge, no employees providing services at the Business have any plans to terminate employment with Seller.  Company is in compliance with all applicable laws respecting employment and employment practices and terms and conditions of employment, including, but not limited to (i) any welfare plan within the meaning of Section 3(1) of the Employee Retirement Income Security Act of 1974 ("ERISA"), (ii) any pension benefit plan within the meaning of Section 3(2) of ERISA, (iii) any stock bonus, stock purchase, stock option, restricted stock, stock appreciation right or similar equity-based plan or (iv) any other deferred-compensation, retirement, welfare-benefit, retention, employment, consulting, change in control, severance or termination pay, hospitalization or other medical, dental, life, vision, disability or other insurance, supplemental unemployment benefits, profit sharing, pension or retirement, bonus, incentive or fringe-benefit plan, program or arrangement including any "employee benefit plan" within the meaning of Section 3(3) of ERISA as to which the Seller or any of their respective affiliates, sponsors, maintains, contributes or is obligated to contribute, or under which the Company or any of its respective ERISA affiliates has or may have any liability, or which benefits any current or former employee, manager, director, consultant or independent contractor of the Company or any of its respective affiliates or the beneficiaries or dependents of any such person, are in compliance with applicable laws and regulations related thereto.  To Seller's Knowledge, no employee has maintained any personal romantic relationship with any patient or other employee of the Business nor has any employee made any allegations against any other employee of any actions that may violate applicable laws or regulations.  The Company is not engaged in any unfair labor practice with respect to any of its employees and the Company does not have any material employee grievance or other employee dispute pending that involves any of its employees. The Company is not the subject of any complaint, charge, investigation, audit, suit or other legal process with respect to any of its employees, or any of the terms or conditions of their employment.

6.6.     Tax Matters.  The Company has duly and timely filed (or filed for valid extensions on) all federal, state, local and foreign tax returns that are required to have been filed by it relating to the operation of the Business.  All such returns are true, correct and complete in all material respects as filed, were prepared in good faith and in accordance with all applicable tax rules and regulations.  Seller has paid all taxes shown.  There are no material taxes owed by Seller with respect to the operation of the Business due as of the date hereof that have not been paid.  Seller has withheld and paid all taxes with respect to the operation of the Business required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party.  Seller is a party to no action or proceeding by any governmental authority for assessment or collection of taxes with respect to the Purchased Assets or the Business.  No deficiency assessment or proposed adjustment of Seller's federal, state, local or foreign taxes is pending, and to Seller's Knowledge, there is no proposed undisclosed liability for any tax to be imposed upon its properties, assets or business with respect to the operation of the Business.

6.7.     Properties and Title to Assets.  Seller has full right, title (or leasehold interests) and interest in the Purchased Assets, free and clear of any mortgage, lien, security interest, writ, attachment or other encumbrance and Seller has full authority to, and will, on the Closing Date transfer to Purchaser good, clear and marketable title to the Purchased Assets.  Except for the Excluded Assets, the Purchased

Assets constitute all of the assets owned and held by or used by Seller in, or necessary for, the conduct of the Business on the date hereof. Seller enjoys peaceful and undisturbed possession under all leases under which it operates. All such leases are valid and existing with no material default existing thereunder on the part of Seller, or, to the Knowledge of Seller, on the part of any other party thereto.

6.8.    <u>Litigation</u>.    There are no judicial or administrative actions, suits, claims, proceedings or investigations pending or, to Seller's Knowledge, threatened (i) against Seller and involving the Business, Purchased Assets or any officer, director, employee or independent contractor of the Business, or (ii) which would prevent full performance by Seller of its obligations under this Purchase Agreement or any of the other Transaction Documents or the consummation of the transactions contemplated hereby, nor to Seller's Knowledge is there any basis for any such action, suit, proceeding or investigation.

6.9.    <u>Patients</u>.    Schedule 7 contains a complete and accurate list of all active patients of the Business. To the Knowledge of Seller, no patients have notified Seller of an intent to cease their relationship with the Business or Seller. Schedule 8 is a complete and accurate schedule of total treatments by CPT code by third party payor by provider for the last twenty-four months. To Seller's Knowledge, there are no pending events or actions that would lead to a material diminution in the treatments set forth on Schedule 8. Seller is not aware of any fact or circumstance (*e.g.*, patient complaints, removal of the Seller from a third-party payor network) that would cause Seller to believe that a material number of the Seller's active patients of record will not continue to do business with the Seller following the Closing Date.

6.10.    <u>Health Care Regulatory</u>.    The Company (including its employees and contractors) is and, at all times has been, in compliance with all Healthcare Laws and with all of their respective Permits, and have not received any notice or communication from any Governmental Authority or any Medicare, Medicaid or TRICARE program, any other federal or state health program (as defined in 42 U.S.C. § 1320a-7b(f)) or other similar federal, state or local reimbursement or governmental program for which the federal, state or local government pays, in whole or in part, directly or indirectly, for the provision of healthcare services or goods (each, a "<u>Government Program</u>"), non-governmental insurance program, managed care organization or other third-party payor (each, a "<u>Third-Party Payor</u>") that alleges noncompliance with any Healthcare Laws by the Seller. Without limiting the generality of the foregoing: (i) neither the Seller nor any of its directors, officers, employees, independent contractors, shareholders, members, managers and agents have engaged in any activity or entered into any Contracts or other arrangements which is prohibited under the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, and/or the regulations promulgated thereunder, or applicable state or local fraud and abuse statutes or regulations; and (ii) neither the Seller nor any of its directors, officers, employees, shareholders, members, managers or agents acting on its behalf has established or maintains a "financial relationship," as that term is defined by the Stark Law or applicable state or local Stark-type statutes or regulations, with a physician or an immediate family member of a physician if such physician refers patients to the Seller unless such financial relationship meets an exception to the Stark law or applicable state or local Stark-type statutes or regulations. The Company and the Business as currently conducted do not require any insurance license, clinic license, laboratory license, pharmacy license, facility license, or other professional license under any Legal Requirement that has not been obtained.

6.11.    <u>Adequacy Representations and Warranties</u>.    To Seller's Knowledge, neither this Purchase Agreement, nor any other agreement, document, certificate, or statement furnished or to be furnished to Purchaser by or on behalf of Seller in connection with the transactions contemplated hereby, contains any untrue statement of a material fact or omits to state any material fact necessary in order to make the statements and information contained herein or therein not misleading. To Seller's Knowledge, all copies of contracts, permits, reports and other documents described in this Purchase Agreement which have been or will be furnished or caused to be furnished to Purchaser by Seller in connection with the Purchase Agreement and the transaction contemplated hereby are true, complete and accurate, are current

as of the date thereof, are in full force and effect and have not been amended or modified by any oral agreements.

6.12.    Payors.  Schedule 9 of this Agreement sets forth a list of: (a) the top 10 payors of the Business for the fiscal year ended December 31, 2021 (based on the amount of revenues recognized by the Company) (each, a "Material Payor"), (b) the top 10 sources of business to the Business for the fiscal year ended December 31, 2021 (based on the amount of revenue received by the Company) (each, a "Material Business Source"). Except as described on Schedule 9 of this Agreement, to Seller's Knowledge: (a) no Material Payor or Material Business Source plans to stop or materially decrease the amount of business done with Seller and (b) no Material Payor or Material Business Source has requested or received a decrease in the rates or prices paid to or paid by, as applicable, the Seller that is inconsistent with the terms of its existing agreement with Seller.

6.13.    Environmental Matters. To Seller's Knowledge, the Seller is, and has been, in compliance in all material respects with all Environmental Laws and has not received from any Person any notice relating to Environmental Laws. "Environmental Laws" means any Legal Requirement relating to (i) releases or threatened releases of Hazardous Substances, (ii) pollution or protection of public health or the environment or worker safety or health or (iii) the manufacture, handling, transport, use, treatment, storage, or disposal of Hazardous Substances.

6.14.    Affiliate Transactions. (a) no security holder, including Shareholder, and any manager, director, officer, consultant, independent contractor or employee of the Company (any such individual, a "Related Person"), or, to the Knowledge of Seller and Shareholder, any affiliate or member of the immediate family of any Related Person, is, or since January 1, 2015, has been, directly or indirectly, involved in any business arrangement or relationship with the Company or any supplier or payor material to the conduct of the Business, other than employment arrangements with the Company entered into in the ordinary course of business, and (b) no Related Person or any affiliate or member of the immediate family of any Related Person, directly or indirectly, owns, or since January 1, 2015, has owned, any material property or right, tangible or intangible, used by the Seller in the conduct of the Business

6.15.    Accounts Receivable; Accounts Payable. Schedule 10 sets forth a true, correct and complete list of the accounts receivable and accounts payable of the Seller and related aging reports as of and including the Closing Date. All of the accounts receivable, unbilled invoices and Debts due to the Company (a) constitute bona fide receivables that arose in the ordinary course of business, (b) are legal, valid and binding obligations of the obligors and (c) are collectable in ordinary course of business consistent with past practices by the Company. No accounts receivable are impaired or offset by amounts owed as a refund of credit to the responsible party. All accounts payable and notes payable of the Company arose in the ordinary course of business.

6.16.    Absence of Certain Changes. Since December 31, 2020, except as set forth on Schedule 11, the Business has been conducted only in the ordinary course of business consistent with the Seller's past practice, and there has not been, with respect to the Company or the Business:

(a)        any damage, destruction, eminent domain taking (completed or pending) or other casualty loss (whether or not covered by insurance) affecting the Company, the Business or any Assets in any material respect;

(b)        any creation or other incurrence of any Lien on any material Asset;

(c)      any material change in any method of accounting or accounting practice (including with respect to reserves) with respect to the Company;

(d)      any amendment to the Organizational Documents;

(e)      any increase or material alteration to the compensation payable or paid, or alteration in the timing or method of such payments, whether conditionally or otherwise, to any employee or consultant, other than in the ordinary course of business consistent with the Seller's past practice;

(f)      any change in connection with the Company's accounts payable or accounts receivable terms, systems, policies or procedures, including (i) taking (or omitting to take) any action that has or would reasonably be expected to have the effect of accelerating revenues or accelerating cash receipts to periods prior to the Closing Date that would otherwise be expected to take place or be incurred during periods after the Closing Date, (ii) delaying or postponing the payment of any accounts payable or notes receivable or (iii) accelerating the collection of or discounting any accounts receivable or notes receivable;

(g)      any making, changing or revoking of any material Tax election, change to methods of accounting for Tax purposes, settlement in respect of Taxes or agreement entered into with respect to Taxes with any United States federal, state or local authority, agency or commission entitled to exercise any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power, any court or tribunal (or any department, bureau or division thereof), or any arbitrator or arbitral body ("Governmental Authority");

(h)      any adoption, amendment or increase in the payments or benefits under any Company Plan outside the ordinary course;

(i)      any event or circumstance that has had, or is reasonably likely to have, a Material Adverse Effect on the continued operation of the Business;

(j)      any split, combination or reclassification of any of the Ownership Interests of the Company;

(k)      any issuance, sale or other disposition of any of the Ownership Interests of the Company except as disclosed herein;

(l)      any capital investment in, or any loan to, any individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity by Company (a "Person");

(m)      any entry into a new line of business or abandonment or discontinuance of any existing lines of business by Company; or

(n)    any acquisition by merger or consolidation with, or by purchase of a substantial portion of the stock or assets of, or by any other manner, any business or any Person or any division thereof except as disclosed herein.

6.17.    <u>Debt; Guarantees</u>. The Company has no Debt except as set forth on <u>Schedule 12</u>. For each item of Debt, <u>Schedule 12</u> correctly sets forth the debtor, the principal amount of the Debt as of the date of this Agreement, the creditor, the maturity date, and the collateral, if any, securing the Debt. The Seller has no liability in respect of a guarantee of any liability of any other Person. "<u>Debt</u>" means all obligations (including all obligations in respect of principal, accrued interest, penalties, fees and premiums) (a) for borrowed money (including overdraft facilities), (b) evidenced by notes, bonds, debentures or similar Contracts, (c) for the deferred purchase price of property, goods or services (other than trade payables or accruals incurred in the ordinary course of business), (d) under capital leases, (e) in respect of letters of credit and bankers' acceptances, (f) for Contracts relating to interest rate protection, swap agreements and collar agreements and (g) in the nature of guarantees of the obligations described in clauses (a) through (f) above of any other Person.

6.18.    <u>Real Property</u>.  <u>Schedule 13</u> sets forth a complete and accurate list, including addresses, of each leasehold interest in real property leased, subleased, or licensed by, or for which a right to use or occupy has been granted to, or by, the Seller that is leased, managed, used or operated by the Seller in the conduct of the Business (the "<u>Leased Real Property</u>" and any buildings, equipment, improvements or structures located thereon, the "<u>Facilities</u>").  <u>Schedule 13</u> also identifies, with respect to the Leased Real Property, each lease, sublease, license or other contractual obligation under which the Company occupies or uses such Leased Real Property, including the date of and legal name of each of the parties to such lease, sublease, license or other contractual obligation (the "<u>Real Property Leases</u>").  Except as set forth on <u>Schedule 13</u>, there are no written or oral subleases, licenses, concessions, occupancy agreements or other contractual obligations granting to any other Person the right of use or occupancy of the Leased Real Property and there is no Person (other than the Company) in possession of the Leased Real Property.  Each party to the Real Property Leases is in full compliance with the terms of each Real Property Lease.  The Company has a valid leasehold interest in and to each of the Leased Real Properties, free and clear of all encumbrances.  The Facilities are in good operating condition and repair and are suitable, adequate and sufficient for the purposes for which such Facilities are used. All Permits necessary in connection with any construction upon, and present use and operation of, the Leased Real Property and the lawful occupancy of the Leased Real Property have been issued by the appropriate authorities.

6.19.    <u>Material Contracts</u>. Set forth on <u>Schedule 14</u> is a list of each contract, agreement, lease, instrument or understanding (written or oral) to which the Company is a party or that otherwise relates to the Business or the Assets  that are not terminable by the Company on thirty (30) days or less prior written notice and without penalty and that contemplate payments by or to Seller that exceed or are reasonably expected to exceed $25,000 ("Contracts"). The Company has provided to Purchaser a true, correct and complete copy of each Contract (or written description of any oral Contracts), in each case as amended or otherwise modified and in effect. Each Contract is in full force and effect and constitutes a legal, valid and binding agreement, enforceable in accordance with its terms, of each party thereto. The Company has performed all of its required obligations under each Contract, and is not in violation or breach of or default under any Contract. To Seller's Knowledge, the other parties to each Contract have not been and are not in violation or breach of or default under such Contract. To Seller's Knowledge, there exists no event, occurrence, condition or act which constitutes, or with the giving of notice or the lapse of time or both would become, a default of any Contract. To Seller's Knowledge, no event, occurrence, condition or act exists or has taken place that constitutes, or with the giving of notice or the lapse of time or both would constitute, a default of any Contract. There are no renegotiations or, to Seller's Knowledge, outstanding rights to negotiate, any amounts to be paid or payable to or by the Seller, under any Contract other than with respect to non-material amounts in the ordinary course of business, and no Person has made a written

demand for such negotiations or otherwise provided notice of intent to terminate or adversely modify their relationship or Contract with the Seller. The Seller has not released or waived any of its rights under any Contract.

6.20.   Brokers, Finders, etc.   To Seller's Knowledge, all negotiations relating to this Purchase Agreement and the transactions contemplated hereby have been carried on without the intervention of any Person acting on behalf of Seller in such manner as to give rise to any valid claim against Seller or Purchaser for any brokerage or finder's commission, fee or similar compensation.

6.21.   Compliance with Laws.   Shareholder and, to Seller's Knowledge, each employee is in material compliance with all laws and regulations applicable to Seller and the Business.

6.22.   Violation of Other Instruments.   To Seller's Knowledge, neither the execution, delivery nor performance of this Purchase Agreement or any of the other Transaction Documents by Seller (i) is prohibited by any provision of applicable law or regulation or by judicial decree, order or judgment to which Seller is a party or by which Seller or any of Seller's properties or assets are bound or (ii) will conflict with, result in a breach of, or constitute a default under Seller's articles of incorporation, bylaws or any mortgage, indenture, lease, license, guarantee, agreement or understanding, whether oral or written, to which Seller is a party or by which any of the Purchased Assets are bound.  To Seller's Knowledge, such execution, delivery, performance and consummation will not result in the creation of any lien, charge, encumbrance or security interest upon any of the Purchased Assets, or give rise to any right of termination. To Seller's Knowledge, no approvals of any governmental agency is required with respect to the consummation of the transactions contemplated by this Agreement.

7.   REPRESENTATIONS AND WARRANTIES OF PURCHASER.   Purchaser represents and warrants to Seller that the statements contained in this Section 7 are correct and complete as of the date of this Purchase Agreement and will be correct and complete as of the Signing Date and as of the Closing Date.

7.1.   Status of Purchaser.   Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware. Purchaser has all permits that are necessary to enable it to own, lease or otherwise hold its properties and assets and to carry on its business as it is now conducted and as it is now contemplated by Purchaser to be conducted in the State where the Business conducts its operations (including ownership of the Purchased Assets).  Purchaser has the full legal right, power and authority to execute, deliver and perform this Purchase Agreement and the other Transaction Documents to which it is a party and to carry out all transactions contemplated hereby and thereby, and each of this Purchase Agreement and the other Transaction Documents to which it is a party constitutes a valid and binding obligation of Purchaser enforceable in accordance with its terms.

7.2.   Authority for Agreements: Violation of Other Instruments; Litigation.   All necessary limited liability company actions have been taken by Purchaser to authorize the consummation of the transactions contemplated hereby and the execution and delivery of this Purchase Agreement and the other Transaction Documents to which Purchaser is a party and all other instruments executed and delivered herewith.  Neither the execution, delivery nor performance of this Purchase Agreement or any of the other Transaction Documents by Purchaser (i) is prohibited by any provision of applicable law or regulation or by judicial decree, order or judgment to which Purchaser is a party or by which Purchaser or any of Purchaser's properties or assets are bound or (ii) will conflict with, result in a breach of, or constitute a default under Purchaser's operating agreement or any mortgage, indenture, lease, license, guarantee, agreement or understanding, whether oral or written, to which Purchaser is a party or by which any of Purchaser's properties are bound, except for conflicts, breaches, or defaults that in the aggregate would not have a Material Adverse Effect on the operation of the Business taken as a whole.

7.3. <u>Brokers, Finders, etc.</u> All negotiations relating to this Purchase Agreement and the transactions contemplated hereby have been carried on without the intervention of any Person acting on behalf of Purchaser in such manner as to give rise to any valid claim against Seller or Purchaser for any brokerage or finder's commission, fee or similar compensation.

8. <u>SURVIVAL OF REPRESENTATIONS AND WARRANTIES</u>. All of the representations and warranties by, respectively, the Purchaser and the Seller in this Purchase Agreement or in any document, statement, certificate or other instrument referred to herein or delivered at the Closing Date in connection with the transactions contemplated hereby shall survive the Effective Date and, if applicable, the Closing Date and shall continue in full force and effect until the expiration of the statute of limitation for a claims of the nature covered by the relevant representation.

9. <u>INDEMNIFICATION</u>.

9.1. <u>By Shareholder</u>. The Shareholder agrees to indemnify and hold Purchaser and each of Purchaser's members, managers, directors and officers harmless, together with their successors and assigns (each an "Indemnified Party"), from, against and in respect of all liabilities, obligations, judgments, liens, injunctions, charges, orders, decrees, rulings, damages (excluding punitive damages, unless a Purchaser Indemnified Party is required to pay such damages in connection with a third-party claim, and including consequential damages, lost profits, diminution of value, valuation metrics and other multiple based damages), dues, assessments, taxes, losses, fines, penalties, expenses, fees, costs, amounts paid in settlement (including reasonable attorneys' fees and other costs and disbursements in connection with investigating, defending or settling any action or threatened action), arising out of any claim, damages, complaint, demand, cause of action, audit, investigation, hearing, action, suit or other proceeding asserted or initiated or otherwise existing in respect of any matter (collectively, the "Losses" and each, individually, a "Loss") that result from:

(1) the inaccuracy of any representation or warranty made by Seller or Shareholder herein or in any Transaction Document, or resulting from any misrepresentation, breach of warranty or nonfulfillment of any agreement or covenant of Seller contained herein or in any Transaction Document;

(2) any Excluded Liabilities; and/or

(3) any claim, suit, or action brought by a director or officer of Seller relating to any events occurring since its inception until the Closing Date.

If Purchaser is of the opinion that any Loss has occurred or will or may occur, the Purchaser shall so notify the Seller specifying in such notice the circumstances of such Loss. Notwithstanding the foregoing, Seller shall have no liability for Losses related to Section 9.1(1), other than with respect to Sections 6.1, 6.2, 6.3, 6.10 and 6.20 or fraud, until such time as Purchaser shall have accumulated total Losses related thereto (or otherwise under this Agreement) exceed one percent of the Purchase Price in the aggregate (the "Threshold Loss"). Once the Threshold Loss has been exceeded, Seller shall be responsible to indemnify Purchaser for the full amount of any Losses subject to the maximum liability specified in the foregoing sentence. In addition, not substitution of any other remedies available to Purchaser at law or equity, Purchaser shall be entitled to offset any Losses against any remaining amounts of the Purchase Price hereunder that is than unpaid upon written notice to Shareholder.

9.2. <u>By Purchaser</u>. Purchaser agrees to indemnify and hold Seller and Shareholder, their member, directors and officers, harmless, together with their successors and assigns (each a "Seller Indemnified Party"), from Losses that result from:

DocuSign Envelope ID: 69842BA5-39B5-4393-9263-8E5142B7C758

(1) the inaccuracy of any representation or warranty made by Purchaser herein or in any Transaction Document, or resulting from any misrepresentation, breach of warranty or nonfulfillment of any agreement or covenant of Purchaser contained herein or in any Transaction Document;

(2) any Assumed Liability; and/or

(3) Purchaser's ownership and operation of the Business on and after the Closing Date.

If Seller is of the opinion that any Loss has occurred or will or may occur, Seller shall so notify Purchaser, specifying in such notice the circumstances of such Loss.

9.3.   <u>Notice of Claims</u>.  In the event that any Indemnified Party or Seller Indemnified Party shall receive any notice of any claim or proceeding against said party (the "Indemnitee") that gives rise to rights of indemnification hereunder, the Indemnitee shall give the other party (the "Indemnitor") written notice thereof within (5) days of knowledge thereof by prepaid registered or certified mail, return receipt requested, and the Indemnitor shall have the right to contest and conduct the defense of any action brought against the Indemnitee at the Indemnitor's own expense provided, however, that if the Indemnitor shall fail to notify the Indemnitee of the assumption of the defense of any such action in writing within thirty (30) days after the receipt of notice from the Indemnitee, then the Indemnitee shall have the right to take any such action it deems appropriate to defend, contest, settle, or compromise any such action or assessment and claim indemnification as provided herein, nothing herein shall preclude Indemnitee from taking any actions required to be taken (such as interposition of a responsive pleading because) of statutory or other time constraint.  If the Indemnitor does defend any action for which Indemnification is claimed, the Indemnitee shall be entitled to participate, at its own expense, in the defense of such action, which defense, however, shall be conducted and managed by the Indemnitor.  Failure of the Indemnitee to notify the Indemnitor of any claim for which it is entitled to indemnify hereunder shall not impair, limit, or affect the indemnification provided herein so long as the ability of the Indemnitor to contest, defend, or dispute such claim has not been materially and adversely affected or the Indemnitor has not otherwise been prejudiced by such failure.

9.4.   <u>Survival; Effects of Investigation</u>.  The covenants, and obligations contained in or made pursuant to this Agreement will survive the execution and delivery of this Agreement and the Closing and will continue in accordance with the terms of such covenants and obligations. Upon providing notice in accordance with <u>Section 9.3</u> of this Agreement, the Purchaser Indemnified Party is then permitted to pursue such claim in accordance with this <u>Section 9</u>, regardless of any time limitation or when the Losses are actually incurred. For purposes of determining breach and indemnification amounts, materiality and Material Adverse Effect qualifiers in the representations and warranties shall be ignored.  The right to indemnification, reimbursement, or other remedy based on the representations, warranties, covenants, and obligations of the Seller and Shareholder will not be affected by any investigation, analysis or evaluation conducted by Purchaser or its representatives with respect to, or any knowledge acquired (or capable of being acquired) about the accuracy or inaccuracy of or compliance with, any such representation, warranty, covenant, or obligation, whether or not such knowledge was acquired prior to the Closing except to the extent explicitly disclosed to Purchaser herein or on any scheduled attached hereto, and a claim for indemnification and all corresponding rights to indemnification, reimbursement, or other remedy will survive the limitations periods set forth above (and any such limitations periods shall be tolled) to the extent a timely claim notice is given in good faith.  For purposes of determining breach and indemnification amounts, materiality and Material Adverse Effect qualifiers in the representations and warranties shall be ignored.

10.   <u>COVENANTS OF SELLER</u>.

The Seller covenants and agrees that:

10.1.   Tax Covenants; 401(k) and Other Retirement Plans.  Each party agrees to make all required tax-related filings, when due, related to the sale of the Purchased Assets hereunder.  Shareholder shall be responsible for terminating any existing 401(k) or other retirement benefit plans of the Company and for all costs related thereto.

10.2.   Insurance.  The Seller shall, at its expense, maintain in full force and effect to the Closing Date, all policies of insurance relating to the Purchased Assets and the Business now in effect and will give notices and present all Claims under such policies of insurance in a timely fashion up to the Closing Date.  Shareholder shall purchase so-called tail insurance coverage beginning on the Closing Date if the Shareholder's base medical malpractice coverage is written on a claims made rather than on an occurrence basis.  Seller's obligation under this Section may be satisfied by maintaining its current policies as of the Closing Date subsequent to the Closing Date.

10.3.   Restrictive Covenants.

(a)   Covenant Not to Compete. From the Closing Date through the date that is five years after the Closing Date (the "Restricted Period"), neither Seller nor Shareholder not, directly or indirectly, except for the benefit of Purchaser, own, manage, engage in, operate or conduct or assist any business, or have any interest in any business or Person, whether as a principal, owner, agent, contractor, employee, shareholder, member, officer, manager, medical director, supervising physician, director, lessor, joint venturer, partner, security holder (except for the passive ownership of publicly-traded securities constituting not more than one percent of the outstanding securities of the issuer thereof), creditor, consultant or in any other capacity that engages in any business that is the same as, similar to, or directly or indirectly competitive, whether through physical offices or telehealth or digital services, whether outpatient or inpatient, with the Business within a 50 mile radius of any Restricted Office. For purposes of this Agreement, "Restricted Office" means the location(s) of the Business and any other office of a behavioral or mental health practice owned, leased, operated or managed by Purchaser, or its affiliates during the Restricted Period; and "Restricted Business" means the Business and any business conducted by Purchaser or any of its affiliates at a Restricted Office.

(b)   Non-Solicitation. During the Restricted Period, neither Seller nor Shareholder will, either on Shareholder's or Seller's own behalf or on behalf of any other Person, other than Purchaser or any of its affiliates, directly or indirectly, or by action in concert with others, (i) solicit or attempt to solicit any person who has been a patient of the Restricted Business with the purpose of obtaining such person as a patient for a business competitive with the Restricted Business, (ii) solicit, induce or attempt to solicit or induce any of the employees, managers, directors, officers, or independent contractors or referral sources of the Restricted Business to discontinue such Person's relationship with the Purchaser or any of its affiliates, or any medical or mental health practice owned, operated or managed by the Purchaser or any of its affiliates, (iii) solicit, induce or hire or attempt to solicit, induce or hire any Person that was an employee, manager, director, officer, or independent contractor of the Restricted Business at any time during the 12 months prior to such solicitation, inducement or hiring or attempt to solicit, induce or hire, (iv) make any disparaging remarks of any sort or otherwise communicate any disparaging remarks about the Restricted Business, the Purchaser, any of their affiliates, or any medical or mental health practice (or the employees thereof) owned, operated or managed by the Purchaser or any of its affiliates, or encourage any business relation or referral sources of the Purchaser or any of its affiliates to adversely modify or discontinue its relationship with the Purchaser or any of its affiliates, or (v) direct any patient to request that his or her medical records be copied or otherwise removed or transferred from the office(s) of the Restricted Business, the Purchaser, any of their affiliates, or any medical or mental health practice owned, operated or managed by the Purchaser or any of their affiliates.

(c)     <u>Remedies</u>. In recognition of the irreparable harm that violation of the covenants of this <u>Section 10.3</u> would cause the Purchaser and/or any of its affiliates, Shareholder agree that the remedy at law for any breach by Shareholder of this <u>Section 10.3</u> will be inadequate and that, in addition to any relief provided by law or in this Agreement, Purchaser will be entitled to injunctive relief, without having to post bond or other security or prove actual damages, it being understood by the Parties that both damages and an injunction will be proper modes of relief and are not to be considered alternative remedies.

(d)     <u>Reasonableness</u>. The Parties agree that the duration and geographic scope of the covenants in this <u>Section 10.3</u> are reasonable to protect the value of the transfer of the Business to Purchaser. Seller and Shareholder acknowledge and agree that Purchaser would not have entered into this Agreement but for Seller's and Shareholder' agreement to the covenants set forth in this <u>Section 10.3</u>.

(e)     <u>Severability</u>. The Parties agree that if a court of competent jurisdiction should find any provision (or portion thereof) of this <u>Section 10.3</u> unenforceable, overbroad or invalid, the provision will be modified by the court to make it enforceable to the maximum extent possible. If the provision cannot be modified, then the unenforceable portion of that provision may be severed and the other parts of this Agreement will remain enforceable.

(f)     <u>Tolling</u>. In the event that Shareholder violates any of the covenants set forth in this <u>Section 10.3</u>, then, notwithstanding any provision in this Agreement to the contrary, the time period specified above for which this <u>Section 10.3</u> is effective will be extended day for day for the time period that Shareholder are in violation of such covenant.

11.     <u>COOPERATION</u>.   Prior to and after Closing Date, Seller and Purchaser shall use reasonable efforts to cooperate with each other in connection with transition of the Purchased Assets to Purchaser and the retention of Excluded Assets by Seller.  The parties shall also use reasonable efforts to cooperate with each other in connection with administrative transition matters, including but not limited to, the completion of accounting audits, tax returns, cost reports, and governmental filings.

12.     <u>FURTHER ASSURANCES</u>.  Each of the parties will, upon request of the other party, execute and deliver without any further consideration such additional instruments of transfer, assignment and further assurance or do or cause to be done such other things, at Purchaser's expense, as may be or are reasonably necessary or desirable to make effective the transfer of the Purchased Assets and other agreements and transactions contemplated by this Purchase Agreement and the other Transaction Documents.

13.     <u>CONFIDENTIALITY</u>.   Except as contemplated by this Purchase Agreement or as necessary to carry out the transactions herein set forth, the terms and conditions of this Purchase Agreement and any documents or information provided in connection with the negotiation and preparation of this Purchase Agreement, as well as the software systems, methods, procedures, policies, controls, documents and pricing and the information relating thereto, and all confidential information relating to the parties, including, but not limited to, patient lists, medical records, the financial condition, marketing plans, regulatory affairs and business strategies of the parties, and all trademarks, service marks, trade-names, copyrights and other proprietary rights in which the parties, as the case may be, has any interest (collectively, the "Confidential Information") shall be maintained confidentially by the other party and, during the term of this Purchase Agreement or thereafter, shall not be utilized by, distributed, disseminated, copied or disclosed to any person, firm or entity except to such officers, directors, trustees, employees and representatives of the parties (and of corporate affiliates of the parties), as reasonably required for the purposes for which such information is furnished, or as may be required by law.  Notwithstanding the foregoing, a party shall be permitted to disclose and use any such information if and to the extent that (a) it is not deemed "confidential" because it is/was either (i) in the public domain at the time of the disclosure

to a party or thereafter become part of the public domain through no act or omission of a party, (ii) was obtained from an independent source under no covenant of non-disclosure with a party, or (iii) was developed independently by a party or (b) it is used during the course of or in connection with any litigation, or other proceeding based upon or in connection with the subject matter of this Purchase Agreement, including without limitation the failure of the transactions contemplated hereby to be consummated.

Each party acknowledges that the breach of the provisions of this Section would cause irreparable injury to the other party that could not be adequately compensated with money.  Accordingly, either party may obtain a restraining order, injunction or other equitable relief prohibiting a breach or threatened breach of the provisions of this Section without the necessity of posting any bond or security whatsoever, in addition to any other legal or equitable remedies that may be available.

14. <u>NOTICES</u>.  Any notice provided for in this Agreement and any other notice, demand or communication required or permitted to be given hereunder or which any party may wish to send to another ("Notice" or "Notices") shall be in writing and shall be deemed to have been properly given if personally delivered or mailed by prepaid certified mail, return receipt requested, to the applicable address(es) below (or such other address as a party shall furnish in writing to the other) and shall be deemed given on the date of receipt or refusal of delivery as the case may be:

<u>If to Purchaser, at</u>:          Behavioral Health Practice Services LLC
10655 NE 4th Street
Suite 901
Bellevue, WA 98004

<u>If to Seller, at</u>:          Perspectives Therapy Services, LLC d/b/a Perspectives
Therapy Services
4863 Aljoann Road
Brighton, MI 48116

<u>If to Shareholder, at</u>:        Tianna Hoppe-Rooney
4863 Aljoann Road
Brighton, MI 48116

15. <u>MISCELLANEOUS</u>.

15.1. <u>Exhibits and Schedules</u>.  All exhibits and schedules attached to this Purchase Agreement are hereby made a part hereof and incorporated herein.

15.2. <u>Entire Agreement; Amendment</u>.  This Purchase Agreement, together with all schedules and exhibits, represents the entire agreement of the parties relating to the subject matter contained herein; <u>provided</u>, <u>however</u>, that nothing contained herein shall limit or otherwise affect any obligations any party has under any of the other transaction documents.  This Purchase Agreement may not be amended except by a written amendment signed by the parties hereto.

15.3. <u>Governing Law; Venue</u>.  This Agreement shall be governed by and interpreted according to the laws of the State of Delaware without regard to such state's conflicts of laws principles. The parties hereby consent to and waive any objection to the jurisdiction and venue of any Wisconsin state or federal court with respect to any action or proceeding relating in any way to this Agreement and the parties agree that any action brought against either party by the other party relating to this Agreement shall be brought in such a court.

- 15 -

15.4.    Waiver of Jury Trial.  EACH PARTY HERETO HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, OR THE SUBJECT MATTER HEREOF OR THEREOF.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

15.5.    Severability.  If any portion or provision of this Purchase Agreement shall to any extent be declared illegal or unenforceable by a court of competent jurisdiction, then the remainder of this Purchase Agreement, or the application of such portion or provision in circumstances other than those as to which it is so declared illegal or unenforceable, shall not be affected thereby, and each portion and provision of this Purchase Agreement shall be valid and enforceable to the fullest extent permitted by law. Notwithstanding the foregoing, if excision of the invalid or unenforceable provision materially affects the rights or obligations of any party under this Purchase Agreement, the parties shall use commercially reasonable efforts to renegotiate the affected terms of the Purchase Agreement upon the request of the affected party.

15.6.    Counterparts.  This Purchase Agreement may be executed in any number of counterpart copies, all of which shall constitute one and the same Purchase Agreement and each shall constitute an original, and shall become effective upon execution by and delivery to each of the parties.

15.7.    No Third Party Beneficiaries.  The parties expressly agree that no third party is an intended third party beneficiary of this Purchase Agreement.

16.    REMEDIES.  The parties hereby agree that, notwithstanding any provision to the contrary herein, in the event of breach of this Agreement by either party or any provision hereunder, the non-breaching party shall have the right to specific performance as a potential remedy, subject to determination by a proper court of law of the appropriate remedy for the non-breaching party's losses.

17.    OTHER DEFINITIONS.  For the purposes of this Purchase Agreement, the definitions set forth on Schedule 15 shall apply.

18.    ATTORNEYS' FEES.  In the event of any controversy, claim or action being filed or instituted between the parties to this Agreement to enforce the terms and conditions of this Agreement or arising from the breach of any provision hereof, the prevailing party will be entitled to receive from the other party all costs, damages, and expenses, including reasonable attorneys' fees, incurred by the prevailing party.  The prevailing party will be that party who was awarded judgment as a result of judgment by a court of competent jurisdiction.

IN WITNESS WHEREOF, the parties have caused this Purchase Agreement to be executed by the undersigned duly authorized persons, under seal, as of the day and year first written above.

**PURCHASER:**

**Behavioral Health Practice Services LLC**

By: 

Name: Ryan Pardo

Title: CLO

**SELLER:**

**Perspectives Therapy Services, LLC d/b/a Perspectives Therapy Services**

By: 

Name: Tianna Rooney

Title: Member

**Perspectives Legacy, LLC**

By:

Name: Tianna Rooney

Title: Member

**SHAREHOLDER:**

By:

Tianna Hoppe-Rooney

**Schedule 1**

**Purchased Assets**

1.  All Company's medical and other equipment, office and other furniture and equipment, furnishings, computer hardware and other computer equipment, telecommunications equipment, tools, instruments and other tangible personal property relating to the operation of the Business, except as specifically set forth on Schedule 2;

2.  All Company's supplies and inventory, including without limitation all office supplies (constituting a minimum of 4 weeks of supplies) and inventories relating to the operation of the Business as they exist as of the Closing Date;

3.  All patents, patent applications, trade names (including the historic name of the Business), trademarks, service marks, logos, domain names, and any registrations or applications relating to any of the foregoing, trade secrets, proprietary processes and information, supplier lists, proprietary software, third party software, websites, business phone numbers, and other intangible property held by Seller through ownership, or to the extent transferrable if held through contract, used in the operation of the Business;

4.  All Seller's software and proprietary rights therein to the extent transferable, in third party software relating solely to the operation of the Business (to the extent transferable);

5.  Non-clinical employee records and related files relating solely to the Business including offer letters and employment agreements;

6.  Company's rights under the Real Property Leases set forth on Schedule 13 and leasehold improvements and fixtures owned by the Company relating to the operation of the Business, which includes but are not limited to any security deposits, electrical and related fixtures, plumbing and filters and related fixtures, HVAC systems, floors, walls, windows, finish carpentry and other finish work and cabinets located in the Facilities which transfer/use shall be subject to the terms of the Real Property Leases and the landlord's rights thereunder;

7.  All Seller's rights related to the ownership and use of the Purchased Assets arising after the Closing Date including, without limitation, all rights under express or implied warranties relating to the Purchased Assets. Notwithstanding the foregoing, any rights arising out of contracts will only be assigned if and as of such time that the relevant underlying contract is assigned to Purchaser and, if required, the third party has consented to such assignment (collectively, with the Real Property Leases, the "Assigned Contracts");

8.  Any other assets of Seller relating to the Business (except for the Excluded Assets) other than assets that, under applicable law or standards, may be held only by a professional entity organized to practice medicine or an entity engaged in the practice of medicine; and

9.  Accounts receivable as of the Closing Date.

DocuSign Envelope ID: 60842BA5-39B5-4393-9253-8EE112B7C758

**Schedule 2**

**<u>Excluded Assets</u>**

(a) Practice-Related Assets

- Clinician employment agreements

- Payor Contracts

- All rights, title, and interest to any Employee Retention Credits or other business credits or tax refunds or returns related to periods of operation of the Business by Seller prior to the Closing Date

(b) Assets not related to the practice

- Assets belonging to Legacy other than the Personal Goodwill

**Schedule 3**

**FTE Clinicians as of Closing Date[1]**

| Clinician | Avg. Weekly Session | FTE |
|---|---|---|
| Wendy Abraham | 4.71 | 0.157 |
| Allison Acton | 1.57 | 0.052 |
| Deborah Adams | 24.95 | 0.832 |
| Scott Adams | 21.33 | 0.711 |
| Allison Azamtarrahia | 8.57 | 0.286 |
| Karen Bailey | 26.05 | 0.868 |
| Samantha Bastianelli | 13.43 | 0.448 |
| Molly Bato | 22.29 | 0.743 |
| Reanna Bell | 23.76 | 0.792 |
| Karen Bester | 20.19 | 0.673 |
| Matthew Bieber | 28.33 | 0.944 |
| Sarah Birchmeier | 21.38 | 0.713 |
| Nicole Blovet | 23.71 | 0.790 |
| Brittney Briggs | 18.95 | 0.632 |
| Kelly Brown | 21.19 | 0.706 |
| Kathleen Burns-Jager | 7.00 | 0.233 |
| Susan Burton | 21.76 | 0.725 |
| Gianna Casaburo | 6.48 | 0.216 |
| Sharee Cesarov | 11.52 | 0.384 |
| Karol Chubb | 8.48 | 0.283 |
| Misty Chung | 10.14 | 0.338 |
| Eileen Craig | 24.76 | 0.825 |
| Brian Dawson | 9.67 | 0.322 |
| Leslie Dicosola | 5.90 | 0.197 |
| Amanda Ducharme | 10.24 | 0.341 |
| Katherine Dyze | 1.52 | 0.051 |
| Katherine Eilers | 13.62 | 0.454 |
| Tonya Farrer | 7.86 | 0.262 |
| Rachel Fleming | 24.62 | 0.821 |
| Ashley Floyd | 24.48 | 0.816 |
| Tara Freni | 9.76 | 0.325 |
| Jenna Gepper | 27.81 | 0.927 |
| Sarah Haney | 15.62 | 0.521 |
| Karen Harasymiw | 9.86 | 0.329 |
| Nicola Herman | 18.00 | 0.600 |
| Susan Imhof | 14.76 | 0.492 |
| Karissa Johnson | 23.71 | 0.790 |
| Rebecca Jokinen | 24.38 | 0.813 |
| Christina Jolokai | 21.05 | 0.702 |
| Stacy Jones | 23.81 | 0.794 |
| Emalie Karp | 12.00 | 0.400 |
| Beth Kennedy | 8.05 | 0.268 |
| Karen Kerr | 8.71 | 0.290 |

---

[1] Back-up data and calculation in EGNYTE folder 1.002

DocuSign Envelope ID: 60842BA5-39B5-4393-9253-8E5142B7C75C

**Schedule 3 (cont.)**

**FTE Clinicians as of Closing Date**

| Clinician | Avg. Weekly Session | FTE |
|---|---|---|
| Sydney Klevering | 18.95 | 0.632 |
| Carly Komaromi | 9.52 | 0.317 |
| Huri Kushner | 36.10 | 1.000 |
| Laurie Lahti | 4.67 | 0.156 |
| Janice Lee | 23.38 | 0.779 |
| Brooke LeFevre | 16.19 | 0.540 |
| Christin Lett | 1.62 | 0.054 |
| Rebecca Malasky | 9.52 | 0.317 |
| Paige Malay | 3.43 | 0.114 |
| Rommark Manlimos | 26.48 | 0.883 |
| Janine McDermott | 20.48 | 0.683 |
| Kate McKee | 24.19 | 0.806 |
| Erin Medeiros | 20.33 | 0.678 |
| Bonnie Miriani | 33.71 | 1.000 |
| Anna Moreno | 2.57 | 0.086 |
| Razia Muhammadi | 1.57 | 0.052 |
| Junetta Nyamu | 12.81 | 0.427 |
| Kelly Ott | 15.62 | 0.521 |
| Jacquelyn Provenzola | 16.19 | 0.540 |
| Hannah Purves | 7.24 | 0.241 |
| Lisa Rae | 23.29 | 0.776 |
| Della Rees | 1.14 | 0.038 |
| Holly Rhode | 2.33 | 0.078 |
| Tami Rolfe | 11.14 | 0.371 |
| Terri Rose | 23.10 | 0.770 |
| Demi Roselle | 4.00 | 0.133 |
| Logan Rubel | 10.43 | 0.348 |
| Tammy Ruterbusch | 20.57 | 0.686 |
| Laura Sagolla | 22.05 | 0.735 |
| Maria Danica San Jua | 23.95 | 0.798 |
| Amelia Schafer | 12.52 | 0.417 |
| Abigail Schoettley | 20.90 | 0.697 |
| Melanie Slep | 12.62 | 0.421 |
| Anthony Solitro | 23.33 | 0.778 |
| Angela Spranger | 19.43 | 0.648 |
| Natasha Sprau | 25.00 | 0.833 |
| Tracy Turpin-Mogeln | 10.33 | 0.344 |
| Denise Urban | 0.71 | 0.024 |
| Abigail Usher | 18.00 | 0.600 |
| Alexis Warner | 21.00 | 0.700 |
| Jodi Wilson-Guzak | 3.14 | 0.105 |
| Nicole Winningham | 11.29 | 0.376 |
| Courtney Yost | 23.76 | 0.792 |
| Christie Young | 24.33 | 0.811 |
| Melanie Zentz | 21.48 | 0.716 |

**Baseline FTE:** 45.687

**Schedule 4**

**Allocation of Purchase Price**

The Purchase Price set forth in Paragraph 3.3 of this Agreement shall be allocated as follows:

A. **Cash.** The value allocated to this category of purchased assets shall be equal to the cash balance of Business bank account XXXX5445 (Shareholder) at Old National Bank as of the Closing Date, net of checks outstanding.

B. **Patient Accounts Receivable**. The value allocated to this category of purchased assets shall be equal to the actual amount of cash collected attributable pre-close dates of service, net of any refunds issued for pre-close dates of service.

C. **Other Assets**.  The value allocated to this category will be the actual dollars paid by Company for such assets. (i.e. security deposits, prepaid rents, etc.)

D. **Accrued Payroll and other Liabilities**. The value allocated to this category will be the actual dollars paid by Purchaser for pre-close dates of service plus reasonable estimate of dollars to be paid if any liability remains open at the end of the fiscal year.

E. **Equipment**. The value allocated to this category of purchased assets shall be equal to the depreciated cost of the equipment as of the Closing Date.

F. **Other Identifiable Intangible Assets**. The value allocated to this category will be determined by outside appraisers following Accounting Standard Codification (ASC 805).

G. **Goodwill**. The remainder of the Purchase Price shall be allocated to this category of assets, as set forth herein. An amount equal to Five Million Nine Hundred Thousand Dollars ($5,900,000) shall be allocated to Legacy's Personal Goodwill. The remainder shall be allocated to goodwill of the Company.

DocuSign Envelope ID: 60843BA5-39B5-4393-9253-8EE143B7C750

**Schedule 5**

**Assumed Liabilities**

None.

DocuSign Envelope ID: 69843BA5-39B5-4393-9353-8E5142B7C75D

**Schedule 6**

**Ownership of Company**

| Member | Ownership Percentage |
|---|---|
| Tianna Hoppe-Rooney | 100% |

DocuSign Envelope ID: 60843BA5-39B5-4393-9353-8E5143B7C750

**Schedule 7**

**Active Patients as of Closing Date**

Information in EGNYTE folder 1.002.

**Schedule 8**

**Treatments Provided by CPT Code**

Information in EGNYTE folder 1.002.

DocuSign Envelope ID: 60842BA5-39B5-4393-9263-8E5112B7C75B

**Schedule 9**

**Material Payor/Material Business Source List**

**(A)**

| | Collections by Payor | | | |
| | FY 2020 | | YTD 11/30/2021 | |
| Payor | $ | % | $ | % |
|---|---|---|---|---|
| BCBS | 3,100 | *51.4%* | 3,804 | *55.6%* |
| Other | 892 | *14.8%* | 934 | *13.6%* |
| Blue Care Network | 940 | *15.6%* | 928 | *13.5%* |
| Managed Medicaid | 334 | *5.5%* | 322 | *4.7%* |
| Self Pay | 276 | *4.6%* | 308 | *4.5%* |
| Aetna | 243 | *4.0%* | 264 | *3.9%* |
| United | 78 | *1.3%* | 124 | *1.8%* |
| Cigna | 20 | *0.3%* | 83 | *1.2%* |
| Medicare | 147 | *2.4%* | 81 | *1.2%* |
| **Total** | 6,029 | *100.0%* | 6,847 | *100.0%* |

No Material Payor, or Material Business Source plans to stop or materially decrease the amount of business done with Company and no Material Payor or Material Business Source has requested or received a decrease in the rates or prices paid to or paid by, as applicable, the Company that is inconsistent with the terms of its existing agreement with such Company.

(B)  The Company does not track revenue by referral source. All referral sources in EGNYTE folder 1.020.

**Schedule 10**

**Accounts Receivable/Accounts Payable**

Information in EGNYTE folder 2.006

**Schedule 11**

**Business Changes**

None.

DocuSign Envelope ID: 60842BA5-39B5-4393-9353-8E5112B7C75D

**Schedule 12**

**Debts**

None.

DocuSign Envelope ID: 60842BA5-39B5-4393-9253-8E5113B7C75B

## Schedule 13

## Real Property Interests

**Perspectives Therapy Services**

Lease Summaries

| # | Location | Address | Lessor | Lease Start | Lease End | Sq. Ft. | Current $psf | Annual Base Rent | Monthly Base Rent |
|---|----------|---------|--------|-------------|-----------|---------|--------------|------------------|-------------------|
| 1. | Brighton | 2200 Genoa Business Park Drive Brighton, MI 48114 | 204 Uptown Center, LLC | 3/1/2022 | 3/1/2027 | 17,000 | $ 13.76 | $ 234,000 | $ 19,500 |
| 2. | Lansing | 1701 Lake Lansing Lansing, MI 48910 | 1701 Lake Lansing, LLC | 3/1/2022 | 3/1/2027 | 3,108 | $ 23.17 | $ 72,000 | $ 6,000 |
| 3. | Fenton | 1100 Torrey Rd Fenton, MI 48430 | Fenton Millennium Center, LLC | 3/1/2022 | 3/1/2027 | 4,100 | $ 16.98 | $ 69,600 | $ 5,800 |
| 4. | New Hudson | 53435 Grand River Avenue New Hudson, MI 48165 | 53425 Grand River, LLC | 3/1/2022 | 3/1/2027 | 3,000 | $ 22.40 | $ 67,200 | $ 5,600 |
| 5. | Highland | 2628 S. Milford Road Highland, MI 48357 | 2628 South Milford Road, LLC | 3/1/2022 | 3/1/2027 | 2,200 | $ 16.36 | $ 36,000 | $ 3,000 |

**Schedule 14**

**Material Contracts**

All payor contracts in EGNYTE folder 1.004.

All major vendor contracts in EGNYTE folder 1.019.

**Schedule 15**

**Definitions**

"Closing Cash Amount" means $382,230.

"Company Plan" means all plans, programs, agreements, policies or arrangements, whether or not reduced to writing, and whether covering a single individual or a group of individuals, that is (i) a welfare plan within the meaning of Section 3(1) of the Employee Retirement Income Security Act of 1974 ("ERISA"), (ii) a pension benefit plan within the meaning of Section 3(2) of ERISA, (iii) a stock bonus, stock purchase, stock option, restricted stock, stock appreciation right or similar equity-based plan or (iv) any other deferred-compensation, retirement, welfare-benefit, retention, employment, consulting, change in control, severance or termination pay, hospitalization or other medical, dental, life, vision, disability or other insurance, supplemental unemployment benefits, profit sharing, pension or retirement, bonus, incentive or fringe-benefit plan, program or arrangement including any "employee benefit plan" within the meaning of Section 3(3) of ERISA as to which the Shareholder, Seller or any of their respective ERISA Affiliates, sponsors, maintains, contributes or is obligated to contribute, or under which the Shareholder, Seller or any of their respective ERISA Affiliates has or may have any liability, or which benefits any current or former employee, manager, director, consultant or independent contractor of the Shareholder, Seller or any of their respective ERISA Affiliates or the beneficiaries or dependents of any such person.

"Excluded Items" means any Losses related to (i) breaches of covenants of Seller or Shareholder, (ii) any indebtedness, taxes, obligations, liabilities, including, but not limited to, refunds due to patients or third-party payors, false claims or overpayment amounts due, contractual or employee obligations, penalties or fines, related to the period from the beginning of time up to the Closing Date, (iii) any claim, suit, or action brought by any person or entity relating to any events occurring since its inception up to and including the Closing Date, (iv) any shortfalls in the Closing Cash Amount, (v) any Losses or other costs associated with coding practices of the Seller or Shareholder prior to the Closing Date and (vi) any Losses resulting from fraud.

"Hazardous Substance" means any pollutant, petroleum or any fraction thereof, contaminant or toxic or hazardous material (including toxic mold), substance or waste.

"Healthcare Laws" means all Legal Requirements that govern, regulate, restrict or relate to the practice of medicine, psychiatry, psychology, psychotherapy, psychoanalysis, osteopathy, nursing, telemedicine, addiction treatment, transcranial magnetic stimulation, workers compensation and disability evaluations, counseling, behavioral health, laboratory services, professional licensure, dispensing medicines or controlled substances or Suboxone, medical documentation, medical record retention, unprofessional conduct, fee-splitting, referrals, billing and submission of claims, fraudulent, abusive or unlawful practices connected in any way with the provision of healthcare items or services or the billing for or claims for reimbursement for such items or services, claims processing, quality of care, medical necessity, informed consent, hiring of employees or acquisition of services or supplies from persons or entities excluded from participation in any Government Program, Information Privacy and Security Laws,

- 33 -

DocuSign Envelope ID: 60842BA5-39B5-4393-9253-8E5112B7C75F

or other healthcare related matters, including without limitation HIPAA and state privacy laws, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395hhh ("Medicare"), including, the Ethics in Patient Referrals Act, as amended, or "Stark Law," 42 U.S.C. § 1395nn; Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v ("Medicaid"); the Federal Health Care Program Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b); the False Claims Act, as amended, 31 U.S.C. §§ 3729-3733; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; the Anti-Kickback Act of 1986, 41 U.S.C. §§ 51-58; the Civil Monetary Penalties Law, 42 U.S.C. §§ 1320a-7a and 1320a-7b; the Exclusion Laws, 42 U.S.C. § 1320a-7, the Federal Controlled Substances Act, 21 U.S.C. § 801 et seq., the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 et seq., Medical Waste Tracking Act of 1988, state corporate practice of medicine laws and interpretations, 42 U.S.C. § 6992, et seq., all applicable regulations promulgated thereunder, rules, ordinances and orders, and any similar state and local statutes, regulations, rules, ordinances, orders or other Legal Requirements that address the subject matter of the foregoing.  "Information Privacy and Security Laws" means all applicable Legal Requirements concerning the privacy, protection, storage, access, use, disclosure and/or security of individually identifiable information including without limitation, the Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act, and their implementing regulations set forth at 45 CFR Part 160, 162 and 164 ("HIPAA"), the federal confidentiality regulations set forth at 42 CFR Part 2 ("Part 2 Regulations"), state data breach notification laws, and the Federal Trade Commission Act.

"Knowledge of Seller" or "to Seller's Knowledge" or any other variation, means to the actual knowledge of Tianna Hoppe-Rooney and Todd Rooney after reasonable investigation.

"Legal Requirements" means all laws, orders, regulations, rules, decrees, interpretations, directives, policies and ordinances relating to, or affecting, Shareholder, Seller, the Business and/or the Assets

"Liens" all liens, security interests, pledges, adverse claims, restrictions, or encumbrances of any kind.

"Material Adverse Effect" means any material adverse change in the Business, condition (financial or otherwise), operations, performance, properties, or prospects of the Business.

"Operating Expenses" means the actual costs of operating the Business for the two-week period immediately subsequent to the Closing Date.

"Organizational Documents" means formation and governance documents of the Seller, including its charter, articles of incorporation, certificate of organization, bylaws, operating agreement or such other formation and governance documents of the Seller, each as amended on or prior to the date hereof.

"Permits" means all permits, certificates, accreditations, licenses, approvals, waivers, certificates, consents and other authorizations (collectively, "Permits") required to conduct the Business and to own, lease, use and operate the Assets.

"Tax" or "Taxes" means (a) any and all federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security (or similar, including FICA), unemployment, disability, real property, personal property, escheat or unclaimed property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other Tax of any kind or any charge of any kind in the nature of (or similar to) Taxes whatsoever, including any interest, penalty, or addition thereto, in each case whether disputed or not and (b) any liability for the payment of any amounts of the type described in clause (a) of this definition as a result of being a member

- 34 -

of an affiliated, consolidated, combined or unitary group for any period, as a result of any Tax sharing, Tax indemnification or Tax allocation agreement, arrangement or understanding, or as a result of being liable for another Person's Taxes as a transferee or successor, by Contract or otherwise

# FIRST AMENDMENT TO
# ASSET PURCHASE AGREEMENT

# AMENDMENT TO
## ASSET PURCHASE AGREEMENT

THIS AMENDMENT TO THE ASSET PURCHASE AGREEMENT (this *"Amendment"*) is made as of April 6, 2022, by and among Perspective Therapy Services, LLC ("*Seller*"), Behavioral Health Practice Services, LLC ("*Purchaser*"), Perspective Legacy, LLC ("*Legacy*" and sometimes with the Company, the Seller and Tianna Hoppe-Rooney ("*Shareholder*"). Purchaser, Seller, and Shareholder are herein individually referred to as a "Party" and collectively referred to as the "Parties  Any capitalized term not defined herein shall have the meaning given it in the Asset Purchase Agreement dated March 1, 2022 (the "*Agreement*") unless otherwise noted.

## RECITALS

WHEREAS, the Parties wish to make certain amendments to the Agreement.

NOW, THEREFORE, the Parties in consideration of the value to the Parties of this Amendment and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, agree as follows:

## AGREEMENT

1.    <u>Amendment of Contingent Payment</u>.  Section 3.2 of the Agreement is amended to delete the sentence reading "The allowed clinical sessions include the following CPT codes: 90791, 90832, 90834, 90837, 90839, 90846, and 90847" and replace it with "The allowed clinical sessions include the CPT codes and relevant times listed on Schedule 3.2, dated April 6th, 2022" and add a new **Schedule 3.2** attached hereto.  In addition, a new sentence is added at the end of Section 3.2 reading "For purposes of calculating the FTEs with respect to the Contingent Payment, clinicians employed by the Seller as of the Closing Date who subsequently relocate away from the Business's location but continue employment with LifeStance Health, Inc. or its affiliates shall continue to count as an FTE equivalent based on the then current number of patient facing time work for LifeStance Health."

2.    <u>Remainder of Agreement Unaffected</u>.  Except to the extent expressly stated herein, the Agreement shall remain in full force and effect as written.

3.    <u>Facsimile and Counterpart Signature Pages</u>.  This Amendment may be executed by facsimile and in one or more counterparts, each of which counterparts will be deemed to be an original and all of which, which taken together, will be deemed to constitute one in the same agreement.

**[Signature Page to Amendment Follows]**

IN WITNESS WHEREOF, the Parties have executed and delivered this Amendment as of the first date written above.

**COMPANY:**

Perspective Therapy Services, LLC

By: *Tianna Rooney, PhD, LMFT*

Name: Tianna Rooney, PhD, LMFT

Title: Member

**LEGACY:**

Perspective Legacy, LLC

By: *Tianna Rooney, PhD, LMFT*

Name: Tianna Rooney, PhD, LMFT

Title: Member

**SHAREHOLDER:**

By: *Tianna Rooney, PhD, LMFT*

Tianna Hoppe-Rooney

**PURCHASER:**

Behavioral Health Practice Services, LLC

By: *Ryan Pardo*

Name: Ryan Pardo

Title: CLO

**Schedule 3.2**

| CPT Code | Amount of Time (Minutes) |
|----------|--------------------------|
| 90791 | 60 |
| 90832 | 60 |
| 90834 | 60 |
| 90837 | 60 |
| 90839 | 60 |
| 90846 | 60 |
| 90847 | 60 |
| 99212 | 10 |
| 99213 | 15 |
| 99214 | 20 |
| 99215 | 40 |
| 90833 | 16 |
| 90836 | 38 |
| 90838 | 53 |
| 90791 | 60 |
| 90792 | 60 |
| 96130 | 60 |
| 96131 | 60 |
| 96136 | 30 |
| 96137 | 30 |

# SECOND AMENDMENT TO
# ASSET PURCHASE AGREEMENT

# I. Foundational Documents

## c) Amendment #2 to Asset Purchase Agreement - by email



RE: Request: CPT code addition to FTE chart in Addendum

**Kevin Mullins**
To ● Mark Matthews; ● David Aziz
Wed 1/11/2023 9:25 AM

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from your computer.

**From:** Todd Rooney <todd.rooney@lifestance.com>
**Sent:** Friday, January 6, 2023 2:35 PM
**To:** Kevin Mullins <kevin.mullins@lifestance.com>
**Cc:** Tianna Rooney <Tianna.Rooney@lifestance.com>
**Subject:** Re: Request: CPT code addition to FTE chart in Addendum

Hi Kevin,

Following up on our conversation from last month, I have attached a table that we are proposing for an amendment to the PA regarding the contingent payment section 3.2.

I have highlighted the changes in yellow, which include:

1. **Adding codes 99202 - 99205:** For the session time, I followed similar practice as was used for other codes: using the minimum billed amount time for each code, while using the AMA guide for time ranges
2. **Correction to time for 99213 & 99214:** also using the minimum billed amount time for these codes, per AMA billing guidelines
3. **Added 90853:** we have a couple of group sessions planned in the coming weeks. I wasn't sure of a time to be used here, so I picked 45 minutes as a typical minimum time amount.

I have also attached the AMA guide that describes the time range required to satisfy billing ranges. Please reference pages 15 - 17 for a listing of the time range for each of the applicable CPT codes.

Can you please arrange for a new Amendment be drafted and circulated to close out this item?

Thanks,
Todd Rooney

I have reviewed with the team and sign off on the attached as the revised schedule for which we will determine contingent payment calculations per the terms of the APA



**Kevin Mullins**
Chief Development Officer
LifeStance Health, Inc.
(c) 781-424-7240
(e) Kevin.Mullins@LifeStance.com

| Schedule 3.2 - Revised | |
|---|---|
| CPT Code | Amount of Time (Minutes) |
| 90791 | 60 |
| 90832 | 60 |
| 90834 | 60 |
| 90837 | 60 |
| 90839 | 60 |
| 90846 | 60 |
| 90847 | 60 |
| 99202 | 15 |
| 99203 | 30 |
| 99204 | 45 |
| 99205 | 60 |
| 99212 | 10 |
| 99213 | 20 |
| 99214 | 30 |
| 99215 | 40 |
| 90833 | 16 |
| 90836 | 38 |
| 90838 | 53 |
| 90792 | 60 |
| 90853 | 45 |
| 96130 | 60 |
| 96131 | 60 |
| 96136 | 30 |
| 96137 | 30 |

# EXHIBIT B

**PROVIDER EMPLOYMENT AGREEMENT**

This Provider Employment Agreement, including the Schedules attached hereto (this "Agreement") is entered into by Company (as defined on Schedule A) and Provider (as defined on Schedule A). Collectively, Company and Provider shall be referred to as the "Parties." In consideration for the promises and covenants in this Agreement, the Parties agree as follows:

**1.   Employment.** Company agrees to employ Provider and Provider agrees to accept employment with Company as described in this Agreement. The employment relationship between Company and Provider shall commence on the Commencement Date (as defined on Schedule A) subject to Provider: (a) providing proof of all necessary and applicable licenses, certifications, and authorizations to perform the Services (as defined below), (b) completing background checks to Company's satisfaction, and (c) satisfying any applicable credentialing processes of Company as determined by Company in its sole discretion.

**2.   Compensation, Benefits and Time Off.** As of the Commencement Date (provided that Provider has commenced providing services as of such date) Provider shall be compensated in accordance with Schedule A and Company policies. Based on Provider's full-time equivalent status, Provider may be eligible to participate in benefit and 401(k) plans, and may be eligible for time off, in accordance with Schedule A and Company and its Affiliate's policies and the applicable plan documents. Company retains the right to terminate or alter any benefit or 401(k) plans or policies from time to time in Company's sole discretion.

**3.   Provider Responsibilities, Representations and Warranties.**

**3.1.   Services.** Provider shall provide services at the facilities operated by Company (collectively, the "Facilities") within the scope of Provider's license and training (the "Services"). The Services provided at the Facilities shall include clinical, mental health, and other counseling, therapy, neuropsychological evaluation and medical management services, as well as related services for which Company can bill. Provider may provide Services at Facilities for Company Affiliates (as such term is defined in Section 11.4 of this Agreement) under the same terms and conditions as this Agreement. Provider represents that he or she is qualified and able to perform the Services. Provider shall exercise his or her professional clinical judgment in accordance with the applicable standard of care. Provider agrees that this Agreement and the employment relationship shall not improperly influence Provider's professional clinical judgment or the provider-patient relationship.

**3.2.   Licensure and Certifications.** As a continuing condition of employment, Provider agrees to maintain all necessary and applicable state and federal licenses, certifications, and authorizations to perform the Services, as determined by Company. Provider shall attend and complete at Provider's own expense all such continuing professional education as may be reasonable and necessary to maintain his/her licensure and certifications. Provider represents that Provider has never: (a) had his or her professional license, DEA license, Medicare or Medicaid provider status or staff privileges at any hospital or medical facility suspended, relinquished, terminated or revoked; (b) been reprimanded, sanctioned, disciplined, suspended, debarred or excluded by any licensing board or any federal, state or local society or agency, governmental body, hospital, third party payer or specialty board; (c) in the last six (6) years, had a final judgment or settlement without judgment entered against him or her in connection with a malpractice or similar action; or (d) in the last six (6) years, been a party to a lawsuit, governmental or administrative proceeding or investigation, related to the practice of Provider's profession, nor, to the knowledge of Provider, have any of the foregoing been threatened. Provider agrees to immediately notify Company in writing if any of the events enumerated in (a)-(d) of this Section should occur during employment.

**3.3.   Compliance.** Provider shall comply with all: (a) laws, rules, accreditation agency standards, applicable professional society ethics codes, and regulations including, without limitation, those relating to the practice of Provider's profession and any applicable supervision requirements; (b) policies, standards, employee handbooks, rules and regulations established by Company, its Affiliates and the Facilities; and (c) agreements to which Company or its Affiliates is a party, or to which Company or its Affiliates may become a party, including without limitation, agreements with the Facilities and government payers and Third Party Payers (as defined in Section 3.8 of this Agreement).

**3.4.   HIPAA.** Provider shall: (a) comply with HIPAA and all other federal, state or privacy and security laws, rules and regulations related to the provision of services hereunder, including, to the extent applicable 42 CFR Part 2; (b) comply with the privacy and security policies of Company, its Affiliates and the Facilities; and (c) only access those patient records required for the Provider's provision of patient care and any other Company approved purposes.

**3.5.   Patient Records.** Provider agrees to timely and accurately complete all patient records, forms, and other documentation with respect to patient care in accordance with applicable laws and the policies and procedures of Company, its Affiliates, the accreditation agencies, government payers and Third Party Payers.

**3.6.   Access to Records.** Upon written request, and in accordance with applicable law, Provider agrees to make available to the appropriate governmental agencies and other applicable, authorized third parties any records and documentation necessary to certify the nature and extent of the Services provided by Provider under this Agreement. Further, Company agrees to provide Provider reasonable access to records necessary to respond to any governmental or third-party payer audit of Provider, including after termination of this Agreement.

**3.7.   Duty to Account.** All accounts receivable and monies due for the Services shall be the property of Company (the "Company Receivables"). Provider assigns to Company all Company Receivables and shall not be entitled to any Company Receivables. Provider appoints Company as his or her attorney in fact to receive, deliver and/or endorse checks, applications for payments, insurance claim forms or other instruments or documents, necessary for Company to fully collect all Company Receivables and other sums due with respect to the Services. This power of attorney is coupled with an interest, is irrevocable and shall survive the termination of this Agreement.

**3.8.   Payers.** While Provider is employed by Company, Company shall have the sole and exclusive right and authority to enter into contractual relationships with HMOs, IPAs, PPOs, ACOs, integrated delivery networks, employer groups, or other managed care or reimbursement arrangements (collectively "Third Party Payer(s)") for Provider's Services. Upon request from Company and in connection with Provider's employment, Provider shall at all times remain credentialed as a participating provider by the Third Party Payers and shall promptly execute all Third Party Payer and government payer documents as a participating provider. While employed by Company, Provider shall not contract with any Third Party Payers without Company's prior written consent. Provider represents and warrants that Provider has never before opted out of Medicare programs, and shall not, while employed by Company, opt out of Medicare programs. Provider agrees to solely accept the compensation paid to him or her by Company for the

Services rendered by Provider during Provider's employment and shall not seek or accept compensation from any patients, Third Party Payer or government payer for such Services. Company shall have the exclusive right to determine the fees charged to clients/patients treated by Provider.

**3.9.** **Publication and Expert Testimony.** While employed by Company, Provider shall not write or publish any articles, books, blogs, or online content, related to the Services or Company or its Affiliates without Company's prior written consent, which consent shall not be unreasonably withheld. Further, in no event shall Provider render services as an expert witness or provide expert testimony without Company's prior written consent, which consent shall not be unreasonably withheld.

**3.10.** **Incident Reporting.** Provider shall immediately notify Company of any incidents, unfavorable occurrences, adverse events, notice or claims arising out of or relating to the Services (the "Incidents") as soon as he or she becomes aware of the Incidents. Provider shall cooperate in the investigation and defense of any Incidents.

**3.11.** **Authority to Enter Into Agreement.** Provider represents and warrants that Provider is not bound by any agreement or restrictive covenant which would prohibit Provider from entering into this Agreement or interfere with Provider's ability to perform the Services.

**3.12.** **Medical/Professional Staff Privileges.** To the extent applicable, as a continuing condition of employment, Provider agrees to maintain medical or professional staff privileges at the Facilities, and acknowledges that Provider's privileges at the Facilities (the "Facility Privileges") are contingent upon Provider's employment with Company. If Provider's employment with Company is terminated for any reason: (a) the Facility Privileges will terminate immediately; (b) Company, or Provider at Company's direction, shall resign Provider's Facility Privileges; and (c) Provider waives any right to challenge or review the termination of the Facility Privileges, and agrees to execute any Facility privileges waiver as reasonably requested by Company. Provider waives all claims of any kind whatsoever, including due process claims, Provider may have against Company, its Affiliates or the Facilities and any other parties with respect to the termination of the Facility Privileges. To the extent there are inconsistent terms in the Facilities' policies or bylaws, the terms of this Agreement shall control. Termination or resignation of Facility Privileges shall not, in and of itself, constitute a negative action reportable as staff membership revocation in future applications by Provider.

**3.13.** **True and Accurate Representations.** Provider declares that all representations and warranties made by Provider in this Agreement and all statements made by Provider in any interviews, employment applications, references, curriculum vitae, staff membership applications, or other documentation submitted to Company or its Affiliates, the Facilities, or third parties are true and correct. Provider agrees to immediately notify Company of any fact or circumstance which occurs or is discovered during employment, which renders or may render any representation or warranty made by Provider untrue. Misrepresentation or omission of any material fact in violation of Provider's representations in this Section, will constitute grounds for termination of this Agreement for cause, consistent with Section 9.2.3 below.

**3.14.** **Additional Actions.** The Parties agree to promptly execute, acknowledge and deliver all further instruments, agreements or documents and do all further acts that are necessary or expedient to carry out this Agreement's intended purposes. If there is an audit of Company regarding billing matters, Provider shall cooperate with Company in any and all aspects of the audit as reasonably requested by Company.

**4.** **Professional Liability Insurance.** Unless otherwise mutually agreed by Company and Provider, Company shall provide and pay for professional liability insurance for Services performed under this Agreement ("PLI"). Company shall procure PLI from an insurer of its choosing with coverage in the amount of not less than $1.0 million per occurrence and $3.0 million in the aggregate. Company may, in its sole discretion but with written notice to Provider: (a) cancel and replace PLI or (b) modify PLI. Upon termination of this Agreement, Company has the right to either continue a claims made policy or purchase tail coverage, so long as there is no coverage lapse.

**5.** **Restrictive Covenants.** Provider agrees that he or she shall be bound by the restrictive covenants set forth on Schedule A. Provider acknowledges that the restrictive covenants set forth on Schedule A are reasonable and necessary to protect the legitimate business interests of Company and do not impose an undue hardship on Provider. If the restrictive covenants are held by a court of competent jurisdiction to be unreasonable, arbitrary or against public policy for any reason, Provider and Company agree that the restrictive covenant(s) shall be modified by the Court as to be reasonable, non-arbitrary and not against public policy. In the event the Court modifies the restrictive covenants, the remainder of the Agreement shall remain in full force and effect. Provider and Company agree that the period of time during which Provider is prohibited from engaging in certain business practices pursuant to the restrictive covenants shall be extended by the length of time during which Provider is in breach of the covenants. The restrictive covenants shall be construed as agreements independent of any other provision in this Agreement, and the existence of any claim or cause of action of Provider against Company or its Affiliates, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement of these restrictive covenants.

**6.** **Confidentiality.** Provider will have access to trade secrets and other confidential information of Company, including, without limitation, technical information, plans, lists of patients, data, records, fee schedules, financial data, computer programs, manuals, processes, methods, intellectual property, contracts, personnel information and employee lists, or the terms of this Agreement (collectively, the "Confidential Information"). Provider agrees that the Confidential Information, even though Provider may have participated in its creation, is Company's exclusive property. Accordingly, except as required by law or for the performance of the Services, Provider shall not, at any time, either during or after employment, use, reveal, report, publish, copy, transcribe, transfer or otherwise disclose to any person, corporation or other entity, any of the Confidential Information without the prior written consent of Company.

**7.** **Outside Activities and Moonlighting.** Only upon the Company's prior written consent, Provider may, during his or her employment with Company, render clinical or consulting services, or other professional services, whether in person on via telemedicine, for any other person or entity, or lecture or engage in other self-employment or employment activities (the "Outside Activities"), so long as: (a) the Outside Activities are not performed during the time period when Services are required and will not interfere with the Services; (b) Provider or another third party procures professional liability insurance coverage for the Outside Activities (the "Coverage") and Provider produces proof of the Coverage and agrees not to cancel, continue, modify, change or substitute the Coverage without prior written notification to Company and (c) the Outside Activities do not violate the restrictive covenants described in Schedule A.

**8.    Substance Abuse.**  Provider shall be subject to, and agrees to comply with the terms of, Company's substance abuse policies, as in effect from time to time.  Provider acknowledges that the prohibitions and obligations set forth in such policies are mandatory and for the benefit of patient health and safety.  Provider shall also comply with any specialty-specific or state-specific drug and alcohol testing policies and other requirements adopted by Company.

**9.    Termination.**

**9.1.  Without Cause.**  This Agreement may be terminated by either party, without cause, at any time, provided written notice of the intent to terminate is given to the other party at least sixty (60) days in advance.

**9.2.  With Cause.**  Company may terminate this Agreement for cause upon any of the following events:

**9.2.1.    Breach.**  Provider breaches any provision of this Agreement (other than Sections 9.2.2 through 9.2.8 below) and the breach, if curable, remains uncured for a period of thirty (30) days after written notice by Company. The events described in Sections 9.2.2 through 9.2.8 below do not require notice or opportunity to cure and are cause for immediate termination.

**9.2.2.    Refusal to Perform or Comply.**  Provider refuses to: (a) perform the Services; (b) follow a lawful direction of a supervisor to perform an act within the scope of Provider's employment; or (c) comply with a directive or policy of Company or any of the Facilities.

**9.2.3.    Impermissible Acts.**  Provider's: (a) misappropriation or diversion of assets or business opportunities of Company or its Affiliates; (b) being charged with, indicted, or convicted of a crime, except a minor traffic offense; (c) commission of fraud, embezzlement, or breach of trust; or (d) misrepresentation or omission of any material fact in violation of Provider's representations in Section 3.13 above; or (e) violation of applicable healthcare laws.

**9.2.4.     Negligence, Intentional Misconduct or Inability to Perform.**  Provider's negligence, intentional misconduct, commission of an act of professional misconduct, failure or inability to competently and adequately perform the Services, or commission of an act that endangers patient health and safety.

**9.2.5.     Reputational Harm.**  Provider's commission of acts that in any way jeopardize or damage the professional integrity or reputation or relationships of Company or any of its Affiliates.

**9.2.6.    Substance Abuse.**  Provider violates Company's drug and alcohol abuse policies.

**9.2.7.    Unprofessional Conduct.**  Provider's substantial or repeated unprofessional behavior including, but not limited to, insubordination; disruptive conduct; inability to get along with colleagues; repeated tardiness; failure to adhere to the published work schedule; failure to respond to call; harassment or discrimination of any kind.

**9.2.8.    Debarment or Exclusion.**  Provider is debarred under any applicable federal or state law, rule, or regulation or is excluded, sanctioned, suspended, or otherwise made ineligible from participating in any federal or state healthcare program.

**9.3.    Failure to Satisfy Conditions to Employment.**  If the conditions set forth in Section 1 have not been met by the Commencement Date, and Company determines that the conditions cannot be met reasonably promptly following the Commencement Date, Company may, in its sole discretion, change the Commencement Date or immediately terminate this Agreement.

**9.4.    Automatic Termination.**  This Agreement shall automatically terminate in the event of:  (a) Provider's death; (b) to the extent permitted by law, Provider's inability to perform the essential functions of his or her job with or without a reasonable accommodation for three (3) months; (c) Company's inability to procure adequate PLI; or (d) the revocation or suspension of Provider's:  (i) professional license in the state where the Provider is providing the Services; (ii) DEA license (if applicable); (iii) Medicare or Medicaid provider status (if applicable); or (iv) other licenses, certifications, or authorizations required to perform the Services.

**9.5.    Obligations Upon Termination.**  Upon termination of this Agreement: (a) to the extent payable under Schedule A, Company shall pay Provider Compensation for services rendered on or before the termination date and accrued benefits or reimbursements, if any, due to Provider as of the effective termination date, less any debts owed by Provider to Company, (b) Provider shall immediately vacate all Company premises and shall promptly deliver to Company all Company property and Confidential Information, and (c) Provider further agrees to comply with Company's policies and procedures, subject to applicable professional codes of ethics, continuation of care laws and other applicable federal and state law, for informing patients/clients treated by Provider that Provider's employment has been terminated. In no event shall the Company have any obligation to pay the Provider any amounts related to the period after the date of termination, including, but not limited to with respect to any remaining Term of the Agreement. In the event that Provider's employment with Company terminates prior to the Initial Term (as defined in Schedule A) of this Agreement, Provider shall reimburse Company for a prorated portion of any One-Time Incentives (as defined in Schedule A), if any, within thirty days of the termination of such employment.  Such reimbursement shall equal to (i) the amount of any One-Time Incentives, if any, multiplied by (ii) the number of months remaining on the Initial Term of this Agreement, divided by (B) the total number of months of the Initial Term of this Agreement. In the event that, upon the termination of Provider's employment, the Provider owes any amounts to the Company, including but not limited to with respect to any One-Time Incentives or Advance Balances, Provider hereby authorizes the Company to deduct any such amounts from any amounts owing from the Company to Provider with respect to services provided prior to the termination date.

**10.  Remedies.**  Provider agrees that the restrictive covenants contained in this Agreement (as set forth on Schedule A) as well as the provisions of this Agreement concerning confidentiality, and Provider's obligation to provide access to records are necessary for the protection of Company's legitimate business and professional duties, ethical obligations and interests, and are reasonable in scope and content.  These legitimate business interests include, without limitation, trade secrets; other valuable confidential business information; substantial business relationships with existing and prospective customers, clients and patients; client and patient goodwill associated with Company's ongoing business; and the extraordinary and specialized training provided by Company.  Provider further agrees that if Provider breaches any of the provisions referenced in this Section, Company may suffer irreparable harm and monetary damages may not provide Company with an adequate remedy.  Accordingly, Provider agrees that Company may, to the extent permitted by applicable law, seek and obtain injunctive relief (without the posting of a bond) against the breach or threatened breach of the referenced provisions as well as all other rights and remedies available at law and equity.

**11.    Additional Provisions.**

**11.1.    Mergers and Consolidation; Successors and Assigns.**  Provider shall not have the right to assign or delegate this personal service agreement or any of his or her rights or obligations under this Agreement.  Company may enter into management service contracts with Affiliates or other third parties for the performance of non-medical services, including but not limited to billing, human resources, information technology, legal, compliance, credentialing and operations.  Further, Company may freely assign and/or delegate any or all of its rights and duties under this Agreement. The Parties agree that upon the sale of all or substantially all of the assets, business and goodwill of Company or all or substantially all of the ownership interests of Company to another company or entity, or upon the merger or consolidation of Company with another company or any other entity, this Agreement shall inure to the benefit of, and be binding upon, both Provider and Company and any company or entity purchasing the assets, business, goodwill or stock of Company or surviving a merger or consolidation with Company. The rights and obligations of Company under this Agreement shall inure to the benefit of and be binding upon and enforceable by its respective successors and assigns.

**11.2.    No Third Party Beneficiaries.**  All obligations of Company under this Agreement are imposed solely and exclusively for Provider's benefit.  No other person shall have standing or any right to enforce Company's obligations under this Agreement.

**11.3.    Ownership.**  Provider shall not be entitled to own any interest, legal or equitable, in Company or its Affiliates, including, without limitation, any right or interest in becoming a shareholder, member or partner.

**11.4.    Definition of Affiliates.**  The term "Affiliates" for purposes of this Agreement means an individual or entity (whether now existing or hereafter created) that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with Company, and each of their directors, officers, employees, and agents.  For purposes of the foregoing, "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of an entity or individual, whether through the ownership of voting securities, by contract, or otherwise.

**11.5.    Notices.**  Whenever any notice, demand or request is required or permitted under this Agreement, that notice, demand or request shall be either hand-delivered in person or sent by United States Mail, registered or certified, postage prepaid, or delivered via overnight courier to the addresses listed on Schedule A or to any other address that either party may specify by notice to the other party or via email to the address listed on Schedule A.  No notice of a change of address shall be effective until received by the other party. A notice shall be deemed received upon hand-delivery, two days after posting in the United States Mail, one day after dispatch by overnight courier or upon confirmation of receipt when sent via email.

**11.6.    Entire Agreement, Construction, Modification, Waiver, Severability.**  This Agreement contains the entire understanding of the Parties and supersedes any prior or contemporaneous agreements between the Parties relating to this Agreement's subject matter.  The headings of the Sections of this Agreement have been inserted for convenience of reference only and shall in no way affect the construction of the terms of this Agreement.  This Agreement shall not be construed against the drafting party.  No modification, termination or attempted waiver of any of the provisions shall be binding unless in writing and signed by the party against whom it is sought to be enforced; provided however, that Company may, without affecting the other terms and conditions of this Agreement: (a) change the Commencement Date; or (b) modify the compensation and reimbursement terms set forth on Schedule A upon notice to Provider.  Failure of a party to enforce one or more of this Agreement's provisions shall not be deemed a waiver of that party's rights under the Agreement or a party's right to enforce any provision of this Agreement.  In the event that any provision of this Agreement is found to be void and unenforceable by a court of competent jurisdiction, then, to the extent permitted by applicable law, such unenforceable provision shall be deemed modified so as to be enforceable or if not subject to modification then eliminated from the Agreement, and the remaining provisions shall nevertheless continue in full force without being impaired or invalidated in any way.

**11.7.    Survival.**  The provisions of Sections 3.8, 3.10, 3.14, 4, 5, 6, 7, 9.5, 10 and 11 and the restrictive covenants described in Schedule A shall survive the expiration or termination of this Agreement.

**11.8.    Counterparts.**  This Agreement may be executed in multiple counterparts (including by means of electronic signatures, facsimile or e-mail in .pdf format), each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

**11.9.    Governing Law.**  This Agreement shall be governed by the laws of the state identified in Schedule A, without regard to that state's conflicts of laws principles.

**11.10.    Litigation; Prevailing Party.**  In the event of any litigation with regard to this Agreement, the prevailing party shall be entitled to recover from the non-prevailing party all reasonable attorney and paralegal fees, costs, and expenses (at pre-trial, trial and appellate levels) unless such recovery is prohibited by applicable law.

**11.11.    WAIVER OF RIGHT TO JURY TRIAL.  EACH PARTY WAIVES ALL RIGHTS TO ANY TRIAL BY JURY IN ALL LITIGATION RELATING TO OR ARISING OUT OF THIS AGREEMENT OR THE RELATIONSHIP OF THE PARTIES. PROVIDER ACKNOWLEDGES THAT THIS JURY TRIAL WAIVER APPLIES TO ANY CLAIM THAT IS BROUGHT AGAINST COMPANY OR ANY OF ITS AFFILIATES.**

Executed as of the dates set forth below:

**PROVIDER:**                                                    **COMPANY:**

*Tianna Rooney*                                                  *Adam Russo*
8619C3844AB574AF...                                              F0B807EDE83B4BE...
Signature                                                        Signature

Name: __Tianna Rooney__                                          Name: __Adam Russo__

Date: __2/28/2022__                                              Title: __Divison President__

                                                                 Date: __3/1/2022__

4

## SCHEDULE A

### Terms and Conditions of Employment

This Schedule A is an addendum to the Provider Employment Agreement.  In the event of any inconsistency between Schedule A and the Provider Employment Agreement, the terms of Schedule A shall control.  Any capitalized terms not defined in Schedule A are defined in the Provider Employment Agreement.

| | |
|---|---|
| **COMPANY NAME AND ADDRESS** | LifeStance<br><br>20500 Eureka Rd., Suite 200 Taylor, MI 48180 USA |
| **PROVIDER NAME, ADDRESS, AND EMAIL** | Name: Tianna Rooney<br>Address: 4863 Aljoann Rd, Brighton, MI 48116<br>Email: trooney@perspectivestherapyservices.com |
| **PROVIDER TYPE** | Licensed therapist |
| **TITLE** | Operations Director |
| **SERVICES** | Services include clinical, mental health, and other counseling, therapy, evaluation and medical management services within the scope of Provider's license, as well as related services for which Company can bill. |
| **FACILITY** | Provider shall initially provide services at Company's Facility located at TBD. Provider and Company may, by mutual agreement, change the location at which Provider provides services during the Term of this Agreement. |
| **COMMENCEMENT DATE** | March 1, 2022 or such other date as the Company shall specify in writing. |
| **TERM** | The initial term of this Agreement shall be for one (1) year from the Commencement Date (the "Initial Term"). After the Initial Term, this Agreement shall automatically renew for additional successive one (1) year terms (a "Renewal Term") on the same terms, conditions and provisions, unless written notice of either party's intention not to renew is delivered to the other party at least ninety (90) days prior to the beginning of any Renewal Term. |
| **EMPLOYMENT STATUS** | Provider shall provide services to patients in the Facilities an average of 40 hours per week.  Provider shall be considered a full-time employee under Company's policies and benefit plans if he or she works at least 30 hours per week.  Company and Provider shall mutually agree upon any change in Provider's weekly hours. |
| **COMPENSATION** | Following the Commencement Date, Company shall pay Provider as follows:<br><br>Base Compensation<br><br>Provider will receive an annual salary of $130,000.<br><br>Company shall pay Provider in accordance with the Company's regular payroll schedule, less required deductions for social security and Medicare tax withholdings, and income tax withholdings. Overpayments or underpayments to the clinician will be adjusted in subsequent pay periods as needed.  In order to process payroll in a timely manner, compensation calculations may be estimated from time to time.  When estimates are used adjustments will be made in the next payroll period. |
| **LONG-TERM INCENTIVE PLAN** | Provider will be eligible to participate in LifeStance Health Group's Long-Term Incentive Plan, as amended from time to time, and receive grants of LifeStance Health Group stock subject to meeting applicable appointment volume and other applicable eligibility requirements under the LTIP. Currently, grants are made on an annual basis (i.e., subject to meeting the eligibility requirements, Provider would receive a grant of stock each year) and vest over a four-year period.. |
| **TIME-OFF** | Provider may take up to three weeks of unpaid time off per year (reduced on a pro rata basis if Provider works fewer than 40 hours), plus six Company recognized holidays per year. |
| **BENEFITS** | Provider may be eligible to participate in benefit and 401(k) plans in accordance with Company and its Affiliate's policies and the applicable plan documents. |

| GOVERNING LAW | Michigan |
|---|---|
| **RESTRICTIVE COVENANTS** | Provider shall not, during the term of his or her employment under this Agreement and for a period of two (2) years thereafter, directly or indirectly, on his or her own behalf or as an owner, principal, partner, stockholder, officer, director, employee, agent, consultant, or independent contractor of any partnership, firm, or entity (other than Company or its Affiliates) (a) provide any medical, psychological, psychiatric, counseling, addiction treatment or other medical, mental, or behavioral health services or other services related to the Services provided hereunder ("Competitive Services") within a ten (10) mile radius of any Facility at which Provider has provided Services (collectively, the "Restricted Area") ; (b) divert or attempt to divert from Company or any of its Affiliates any business or business opportunity whatsoever or offer telehealth or similar remotely delivered services for a competitor to the Company or its Affiliates; or  (c) own, manage, operate, or control a business or enterprise in competition with Company or any of its Affiliates. <br><br> Provider shall not, during his or her employment under this Agreement and for a period of two (2) years after his or her employment under this Agreement is terminated, directly or indirectly, on his or her own behalf or as an owner, principal, partner, stockholder, officer, director, employee, agent, consultant, or independent contractor of any partnership, firm, or entity, induce or solicit or attempt to induce or solicit (i) the patients, healthcare facilities, clinics, PHOs, PPOs, HMOs, integrated delivery systems, third party payers, managed care companies, or any parties or facilities contracted with, serviced by, whether in person or via telemedicine platforms, or who have an agreement with Company or any of its Affiliates (collectively, the "Third Parties") to terminate, curtail or restrict their relationship with Company or any of its Affiliates or (ii) any person employed or contracted by Company or any of its Affiliates to leave his or her employment or contract or not to fulfill his or her contractual responsibility, or hire or engage as an independent contractor any person employed or contracted by Company or any of its Affiliates or who has been so employed or contracted by the Company or any of its Affiliates within the prior six months. <br><br> PROVIDER AND COMPANY AGREE THAT COMPANY OR ITS AFFILIATES AND THEIR RESPECTIVE SUCCESSORS OR ASSIGNS ARE AUTHORIZED TO ENFORCE THESE COVENANTS. |

**PROVIDER:**

Signature: *Tianna Rooney*

Name: Tianna Rooney

Date: 2/28/2022

NPI Number: 1326252610

**COMPANY:**

Signature: *Adam Russo*

Name: Adam Russo

Title: Divison President

Date: 3/1/2022

# EXHIBIT C

DocuSign Envelope ID: B0B35976-C4A0-415D-943C-3CF508857C2B

*Confidential*

### INTERIM SERVICES AGREEMENT

This Interim Services Agreement (this "Agreement") is entered into effective as of March 1, 2022 (the "Effective Date") by and among Behavioral Health Practice Services LLC ("Contractor"), Perspectives Therapy Services, LLC d/b/a Perspectives Therapy Services (the "Company") and Tianna Hoppe-Rooney (collectively, "Owner").

**WHEREAS**, Owner owns all of the issued and outstanding equity interests of the Company;

**WHEREAS,** the Company owns and operates a behavioral and mental health services practice (the "Practice");

**WHEREAS,** pursuant to that certain Asset Purchase Agreement (the "Purchase Agreement") dated as of the Effective Date by and among the Company, Owner, and Contractor or Contractor's affiliate, the Company has agreed to sell, transfer and deliver to Contractor, and Contractor has agreed to purchase from the Company, certain assets used or owned by the Company in connection with its operation of the Practice, which transaction is conditioned, among other things, on the execution and delivery of this Agreement by the Company and Owner;

**WHEREAS**, Contractor and the Company are in the process of transitioning the clinical operations of the Practice to Contractor, including Contractor's arranging for providers who have been employed by Practice to become credentialed under Contractor's payor contracts;

**WHEREAS**, until the completion of Contractor's and the Company's transition of the clinical operations of the Practice to Contractor, the Company shall continue to provide clinical operations at the Practice, and during such interim period the Company desires Contractor to provide or cause to be provided all non-clinical management and other services, the use of certain assets, and the use of certain of Contractor's employees at the Practice, and Contractor desires to provide or cause to be provided such services pursuant to this Agreement; and

**WHEREAS**, pending the determination of Contractor that the transitioning of the clinical operations of the Practice to Contractor is completed to Contractor's satisfaction, the parties desire that the Company maintain its existing licenses, permits, and waivers, if any (the "Existing Licenses") and maintain its third party payor contracts (the "Company Payor Contracts") and remain responsible for services provided under such Company Payor Contracts, subject to Contractor's obligations and support services under this Agreement.

**NOW THEREFORE**, in consideration of the premises and the mutual promises and covenants contained herein, the Company, Contractor, and Owner do hereby agree as follows:

## 1.    ENGAGEMENT

The Company engages the services of Contractor, and Contractor agrees to provide such services upon the terms and conditions hereinafter set forth and in accordance with applicable law.

## 2.    NATURE OF RELATIONSHIP

2.1    Attorney-in-Fact.    Contractor shall furnish all facilities and perform all services described in Section 3 hereof (directly or through affiliates) for the account of and as agent of the Company solely with respect to the Practice. Except as otherwise specifically provided in Section 5, Contractor shall bear the costs and expenses of all services provided by Contractor pursuant to this Agreement.

2.2    Company's Services. Notwithstanding any provision to the contrary, Contractor shall not interfere with the clinical

DocuSign Envelope ID: B0B35976-C4A0-415D-943C-3CF508857C2B

judgment of the medical and other professionals providing services on behalf of the Company. Company shall be responsible to, among other things:

> 2.2.1 Continue arranging for the provision of professional services for patients through its employed or contracted licensed professionals with respect to patients covered by the payers set forth on **Schedule B** hereto;

> 2.2.2 Ensure the provision of a safe physical plant equipped with staff, by contract or otherwise, to maintain the Practice and provide patient services;

> 2.2.3 Provide Contractor with electronic and onsite access to the billing and EMR software systems of the Company used in the Practice in connection with billing, collection, provider compensation and patient care activities of the Practice.

3. **CONTRACTORS'S SERVICES**

Subject to the authority of the Company as set forth in Sections 2.2, respectively, Contractor shall have the responsibility for supervising, consulting and managing the business operations of the Practice and, subject to the terms of this Agreement, shall have the responsibility for coordinating all business and administrative activities (excluding medical services) pertaining solely to the Practice, and providing turnkey facilities to the Company with respect to services provided under the Company Payor Contracts, including, but not limited to, the following (in all cases, solely with respect to services provided under the Company Payor Contracts):

3.1 Other than with respect to government receivables, at Contractor's discretion taking possession of and endorsing in the name of the Company all cash, notes, checks, money orders, insurance payments, and any other instruments received as payment of accounts receivable (and at Contractor's request the Company shall cause individual practitioners who receive directly any payments for the benefit of the Company to deliver such amounts to Contractor, to be handled pursuant to this Agreement in a manner consistent with other payments);

3.2 Other than with respect to government receivables, at Contractor's discretion depositing all such collections directly into one or more Company or Contractor accounts and making withdrawals from such account(s) for such purposes as are consistent with the provisions of this Agreement or to deposit all such collections directly into a depository account in the name of Contractor;

3.3 Other than with respect to government receivables, at Contractor's discretion placing accounts for collection, settling and compromising claims, and instituting legal action for the recovery of accounts. With respect to government receivables, Contractor shall in its discretion assist with billing for the same and at Contractor's request the Company shall enter into an agreement with its depository bank to cause the depository bank to receive such payments and deposit them into an account ("Government Account") in the name of the Company, negotiate such payments, and sweep the proceeds of such account on a daily basis, into one or more bank accounts maintained in the name of Contractor or an affiliate of Contractor.

3.4 Providing the Practice with sufficient clinical and non-clinical staff to ensure an efficient and effective operation of the Practice; ensuring that non-clinical personnel are assigned duties based upon their education, training, competency and job descriptions; and ensuring the provision of non-clinical staff orientation and education;

3.5 Providing the Practice with the facilities in its current locations;

3.6 Performing all duties herein required of it in good faith and with reasonable

*Interim Services Agreement / Page 2*

diligence so as to assure that the Practice efficiently provides appropriate quality health care services to patients; and

3.7    Executing all instruments or documents necessary or appropriate in connection with the above.

4.    **RESPONSIBILITIES OF THE COMPANY AND OWNER**

4.1    <u>Staffing, Licenses, Other</u>.    The Company agrees to retain responsibility and control of the provision of services under the Company Payor Contracts. The Company further agrees to maintain the Existing Licenses, if any, and the Company Payor Contracts in good standing with the applicable governmental authority or third party commercial payor, as applicable, and to obtain and maintain in good standing any licenses with or waivers of licensing requirements of any governmental authorities or any commercial third party payor contracts or amendments thereto as Contractor may request in its sole discretion. Management services provided by Contractor to the Company under this Agreement are at all times subject to the control of the Company with respect to all clinical and medical matters.    All physician services provided at the Practice are within the exclusive control of a licensed physician. In addition, in the event that Contractor begins providing professional services under certain commercial payor contracts or other arrangements before the transitioning of the clinical operations of the Practice from the Company to Contractor is complete, Company agrees to lease from Contractor, and/or lease to Contractor, the services of clinical employees during such times as such employees may provide services under a commercial payor contract held by the other party.

5.    **COMPENSATION FOR SERVICES RENDERED BY CONTRACTOR**

The parties agree that Contractor shall apply the Company's monthly revenues generated by the Practice from the operation of the Practice for the following purposes, in the order set out below:

5.1    <u>Patient/Payor             Refunds</u>. Company revenues shall first be applied to pay any refunds or rebates owed to patients or payors.

5.2    <u>Costs and Expenses of Clinical Personnel</u>.    Company revenues shall next be applied to pay all costs and expenses, including the salary, bonus and benefit expenses (including malpractice insurance expenses) and other compensation, of all clinical personnel (e.g., physicians, physician assistants, nurse practitioners, etc.) of the Practice, if any.

5.3    <u>Practice Office Space and equipment leases</u>. Company revenues shall next be applied to the Practice office and/or equipment lease payments, if any.

5.4    <u>Other Practice purchases and expenses</u>.    Company revenues shall next be applied to other Practice purchases and/or expenses as incurred by the Company such as supplies, security fees, cleaning fees, the purchase of office furniture and/or equipment, overhead, travel expenses etc, if any.

5.5    <u>Management Fee</u>.    Company revenues shall next be applied to pay Contractor a management fee (the "<u>Management Fee</u>") in an amount equal to (and in no event greater than) the Company's remaining revenues related to the Practice after payment of the expenses and other fees set forth in Sections 5.1 through 5.4 above.

The Management Fee shall be paid monthly in arrears.  The parties agree that the Management Fee is fair and equitable, commercially reasonable and consistent with fair market value in exchange for the management services provided hereunder.

6.    **TERM**

The term of this Agreement shall commence on the Effective Date and shall have a term of four (4) months.    Thereafter this Agreement shall automatically renew for additional two (2) month terms unless terminated pursuant to the terms set forth herein. Contractor may terminate this Agreement in its sole discretion immediately upon written notice either

in whole or in part with respect to any specific third party payer listed on **Schedule B** hereto.

### 7.   DEFAULT AND TERMINATION

A party shall be in default of this Agreement if it fails to perform any material term hereof, and such failure is not cured within sixty (60) days after receipt of written notification of such failure from a party not in default. In the event of such default, a non-defaulting party shall have the right to terminate this Agreement immediately by written notice to the defaulting party upon the expiration of such cure period.

### 8.   ASSIGNMENT

Contractor may assign its rights and duties (and right to receive income) under this Agreement to an affiliated or successor entity of Contractor, to a third party as part of a sale of substantially all or a part of Contractor's business, and as otherwise set forth in Section 4.2. The Company may not assign its rights or duties under this Agreement without the prior written consent of Contractor.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

### 9.   NOTICE

All notices, requests, demands, claims and other communications required or permitted to be delivered, given or otherwise provided under this Agreement are to be in writing and are to be delivered, given or otherwise provided: (a) by hand (in which case, it will be effective upon delivery); (b) by facsimile (in which case, it will be effective upon receipt of confirmation of good transmission); (c) by electronic mail during regular business hours (in which case, it will be effective when received); or (d) by overnight delivery by a nationally recognized courier service (in which case, it will be effective on the earlier of the date it is received or the second business day after being deposited with such courier service), in each case, to the address (or facsimile number) listed below (or to such other addresses or facsimile numbers as a party

designates by notice to the other parties in compliance with this Section 9):

If to Contractor:

Behavioral Health Practice Services LLC
c/o LifeStance Health, Inc.
10655 NE 4th St
Suite 901
Bellevue, WA 98004
Attn: Legal Department

If to the Company:

Perspectives Therapy Services, LLC d/b/a Perspectives Therapy Services
4863 Aljoann Road
Brighton, MI 48116

If to Owner:
Tianna Hoppe-Rooney
4863 Aljoann Road
Brighton, MI 48116

### 10.   MISCELLANEOUS

10.1   **Complete       Agreement; Severability**. This Agreement contains the entire agreement among the parties with respect to the subject matter hereof. All prior negotiations and understandings are merged herein. This Agreement may not be modified unless agreed to in writing signed by all parties hereto. Should any part of this Agreement be declared invalid by a court or regulatory body of competent jurisdiction, such decision shall not affect the validity of the remaining parts, and they shall remain in full force and effect.

10.2   **Applicable     Law**.     This Agreement shall be construed and enforced according to the laws of the State of Delaware. Any dispute arising from this Agreement shall be subject to the exclusive jurisdiction of the federal and state courts located in the State of Michigan,

*Interim Services Agreement / Page 4*

DocuSign Envelope ID: B9B35976-C4A0-4A5D-943C-3CF508857C2B

and each Party consents and agrees to the personal jurisdiction of any such court with subject matter jurisdiction in any action under or involving this Agreement and agrees that the State of Michigan is the appropriate venue for the adjudication of any such dispute.

10.3    **Patient Records; HIPAA Business Associate Addendum**. Owner and the Company shall transfer all records solely of the patients treated by the Practice after the Effective Date (the "Patient Records") to Contractor, acting as record custodian.    Contractor will act as custodian of the Patient Records and may use and disclose the Patient Records consistent with HIPAA, including but not limited to, for purposes of treating patients who may request services from the Company.  Contractor shall maintain the Patient Records and provide copies of the Patient Records to patients who are the subject of such patient records and their authorized representatives upon written request and receipt of appropriate documentation verifying the requesting individual's identity or, if applicable, representative's identity and authority, consistent with HIPAA.  For purposes of this Agreement "HIPAA" shall mean the following, each as amended, modified or superseded from time to time: the Health Insurance Portability and Accountability Act of 1996, the Health Information Technology for Economic and Clinical Health Act, the privacy and security regulations issued pursuant thereto (45 C.F.R. Part 160 and Part 164, Subparts A, C, D and E) and applicable state confidentiality requirements relating to the custody, retention, maintenance, confidentiality and privacy of health information. Custody of the Patient Records and, to the extent permissible by applicable law, ownership of the Patient Records, shall be transferred to Contractor upon, and consistent with, the transition of the clinical operations from the Company to Contractor.  The parties agree to comply with the terms of the Business Associate Addendum attached hereto as Exhibit A and incorporated herein by reference.

## 11.    LIMITED RENEGOTIATION

This Agreement shall be construed to be in accordance with any and all federal and state laws, including laws relating to Medicare, Medicaid and other third party payors and state learned profession or professional practice laws. In the event there is a change in such laws, whether by statute, regulation, agency or judicial decision that has any material effect on any term of this Agreement, then the applicable term(s) of the Agreement shall be subject to renegotiation and any party may request renegotiation of the affected term or terms of this Agreement, upon written notice to the other parties, to remedy such condition.

Should the parties be unable to renegotiate the term or terms so affected so as to bring it/them into compliance with the statute, regulation or judicial opinion that rendered it/them unlawful or unenforceable within thirty (30) days of the date on which notice of a desired renegotiation is given, then any party shall be entitled, after the expiration of said thirty (30) day period, to terminate this Agreement upon thirty (30) additional days written notice to the other party.

## 12.    COUNTERPARTS

This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement. The exchange of copies of this Agreement and of signature pages by facsimile transmission or electronically by the parties or the parties' respective attorneys, will constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes. Signatures of the parties transmitted by facsimile or electronically will be deemed to be their original signatures for any purpose whatsoever.

**[Remainder of page intentionally left blank]**

**IN WITNESS WHEREOF**, the parties have caused this Interim Services Agreement to be executed by their duly authorized representatives as of the day and year first above written.

FOR THE COMPANY:

Perspectives Therapy Services, LLC d/b/a Perspectives Therapy Services

By: _Tianna Rooney_____
Name: Tianna Rooney_____
Title: Member_____

FOR OWNER:

By: _Tianna Rooney_____
Tianna Hoppe-Rooney

FOR CONTRACTOR:

Behavioral Health Practice Services LLC

By: _Ryan Pardo_____
Name: Ryan Pardo_____
Title: CLO_____

**EXHIBIT A**

**HIPAA BUSINESS ASSOCIATE ADDENDUM**

This HIPAA Business Associate Addendum ("Addendum") amends and is made part of that certain Interim Services Agreement ("Agreement") by and between Perspectives Therapy Services, LLC d/b/a Perspectives Therapy Services ("Entity") and Behavioral Health Practice Services LLC  ("Associate").

Entity and Associate agree that the parties incorporate this Addendum into the Agreement in order to comply with the requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the Health Information Technology for Economic and Clinical Health Act ("HITECH") and their implementing regulations set forth at 45 C.F.R. Parts 160 and Part 164 (the "HIPAA Rules"). To the extent Associate is acting as a Business Associate of Entity pursuant to the Agreement, the provisions of this Addendum shall apply, and Associate shall be subject to the penalty provisions of HIPAA as specified in 45 CFR Part 160.

1. **Definitions.** Capitalized terms not otherwise defined in this Addendum shall have the meaning set forth in the HIPAA Rules. References to "PHI" mean Protected Health Information maintained, created, received or transmitted by Associate in its capacity as a Business Associate of Entity.

2. **Uses or Disclosures.** Associate will neither use nor disclose PHI except as permitted or required by this Addendum or as Required By Law. To the extent Associate is to carry out an obligation of a Covered Entity under 45 CFR Part 164, Subparts A and E, Associate shall comply with the requirements of 45 CFR Part 164, Subparts A and E that apply to such Covered Entity in the performance of such obligation. Associate is permitted to use and disclose PHI:

(a) to perform any and all obligations of Associate as described in the Agreement, provided that such use or disclosure would not violate the HIPAA Rules, if done by Entity directly;

(b) as otherwise permitted by law, provided that such use or disclosure would not violate the HIPAA Rules, if done by Entity directly;

(c) to perform Data Aggregation services relating to Entity's health care operations;

(d) to report violations of the law to federal or state authorities consistent with 45 CFR § 164.502(j)(1);

(e) as necessary for Associate's proper management and administration and to carry out Associate's legal responsibilities (collectively "Associate's Operations"), provided that Associate may only disclose PHI for Associate's Operations if the disclosure is Required By Law or Associate obtains reasonable assurance, evidenced by a written contract, from the recipient that the recipient will: (1) hold such PHI in confidence and use or further disclose it only for the purpose for which it was disclosed or as Required By Law; and (2) notify Associate of any instance of which the recipient becomes aware in which the confidentiality of such PHI was breached;

(f) to create de-identified information in accordance with 45 CFR § 164.514(b), provided that such de-identified information may be used and disclosed only consistent with applicable law;

(g)    to create a limited data set as defined at 45 CFR §164.514(e)(2), provided that Associate will only use and disclose such limited data set for purposes of research, public health or health care operations and will comply with the data use agreement requirements of 45 CFR §164.514(e)(4), including that Associate will not identify the information or contact the individuals.

In the event Entity notifies Associate of an Individual's restriction request granted pursuant to 45 CFR §164.522 that would restrict a use or disclosure otherwise permitted by this Section, Associate shall comply with the terms of the restriction request.

**3.    Safeguards.** Associate will use appropriate administrative, technical and physical safeguards to prevent the use or disclosure of PHI other than as permitted by this Addendum. Associate will also comply with the applicable provisions of 45 CFR Part 164, Subpart C with respect to electronic PHI to prevent any use or disclosure of such information other than as provided by this Addendum.

**4.    Subcontractors.** In accordance with 45 CFR §§ 164.308(b)(2) and 164.502(e)(1)(ii), Associate will ensure that all of its Subcontractors that create, receive, maintain or transmit PHI on behalf of Associate agree by written contract to comply with the same restrictions and conditions that apply to Associate with respect to such PHI, including but not limited to the obligation to comply with applicable provisions of 45 CFR Part 164, Subpart C.

**5.    Minimum Necessary.** Associate represents that the PHI requested, used or disclosed by Associate shall be the minimum amount necessary to carry out the purposes of the Agreement. Associate will limit its uses and disclosures of, and requests for, PHI (i) when practical, to the information making up a Limited Data Set; and (ii) in all other cases subject to the requirements of 45 CFR § 164.502(b), to the minimum amount of PHI necessary to accomplish the intended purpose of the use, disclosure or request.

**6.    Entity Obligations.** Entity shall notify Associate of (i) any limitations in its notice of privacy practices, (ii) any changes in, or revocation of, permission by an individual to use or disclose PHI, and (iii) any confidential communication request or restriction on the use or disclosure of PHI that Entity has agreed to or with which Entity is required to comply, to the extent any of the foregoing affect Associate's use or disclosure of PHI. Entity shall not request Associate to use or disclose PHI in a manner not permitted by the HIPAA Rules and shall obtain any permissions or authorizations, if any, required to disclose PHI to Associate pursuant to the Agreement.

**7.    Access and Amendment.** In accordance with 45 CFR § 164.524, Associate shall permit Entity or, at Entity's request, an individual (or the individual's designee) to inspect and obtain copies of any PHI about the individual that is in Associate's custody or control and that is maintained in a Designated Record Set. If the requested PHI is maintained electronically, Associate must provide a copy of the PHI in the electronic form and format requested by the individual, if it is readily producible, or, if not, in a readable electronic form and format as agreed to by Entity and the individual. Associate will, upon receipt of notice from Entity, promptly amend or permit Entity access to amend PHI so that Entity may meet its amendment obligations under 45 CFR § 164.526.

**8.    Accounting.** Except for disclosures excluded from the accounting obligation by the HIPAA Rules and regulations issued pursuant to HITECH, Associate will record for each disclosure that Associate makes of PHI the information necessary for Entity to make an accounting of disclosures pursuant to the HIPAA Rules. In the event the U.S. Department of Health and Human Services ("HHS") finalizes regulations requiring Covered Entities to provide access reports, Associate shall also record such information with respect to electronic PHI held by Associate as would be required under the regulations for Covered Entities beginning on the effective date of such regulations. Associate will make information required to be recorded pursuant to this Section available to Entity promptly upon Entity's request for the

DocuSign Envelope ID: B0B35976-C4A0-415D-943C-3CF508857C2B

period requested, but for no longer than required by the HIPAA Rules (except Associate need not have any information for disclosures occurring before the effective date of this Addendum).

9. **Inspection of Books and Records.** Associate will make its internal practices, books, and records, relating to its use and disclosure of PHI, available upon request to HHS to determine compliance with the HIPAA Rules.

10. **Reporting.** To the extent Associate becomes aware or discovers any use or disclosure of PHI not permitted by this Addendum, any Security Incident involving electronic PHI or any Breach of Unsecured Protected Health Information, Associate shall promptly report such use, disclosure, Security Incident or Breach to Entity. Associate shall mitigate, to the extent practicable, any harmful effect known to it of a Security Incident, Breach or use or disclosure of PHI by Associate not permitted by this Addendum. Notwithstanding the foregoing, the parties acknowledge and agree that this section constitutes notice by Associate to Entity of the ongoing existence and occurrence of attempted but Unsuccessful Security Incidents (as defined below) for which no additional notice to Entity shall be required. "Unsuccessful Security Incidents" shall include, but not be limited to, pings and other broadcast attacks on Associate's firewall, port scans, unsuccessful log-on attempts, denials of service and any combination of the above, so long as no such incident results in unauthorized access, use or disclosure of electronic PHI. All reports of Breaches shall be made in compliance with 45 CFR § 164.410.

11. **Term.** This Addendum shall be effective as of the effective date of the Agreement and shall remain in effect until the termination of the Agreement. Either party may terminate this Addendum and the Agreement effective immediately if it determines that the other party has breached a material provision of this Addendum and failed to cure such breach within thirty (30) days of being notified by the other party of the breach. If the non-breaching party determines that cure is not possible, such party may terminate this Addendum and the Agreement effective immediately upon written notice to the other party.

Upon termination of this Addendum for any reason, Associate will, if feasible, return to Entity or destroy all PHI maintained by Associate in any form or medium, including all copies of such PHI. Further, Associate shall recover any PHI in the possession of its agents and Subcontractors and return to Entity or securely destroy all such PHI. In the event that Associate determines that returning or destroying any PHI is infeasible, Associate may maintain such PHI but shall continue to abide by the terms and conditions of this Addendum with respect to such PHI and shall limit its further use or disclosure of such PHI to those purposes that make return or destruction of the PHI infeasible. Upon termination of this Addendum for any reason, all of Associate's obligations under this Addendum shall survive termination and remain in effect (a) until Associate has completed the return or destruction of PHI as required by this Section and (b) to the extent Associate retains any PHI pursuant to this Section.

12. **General Provisions.** In the event that any final regulation or amendment to final regulations is promulgated by HHS or other government regulatory authority with respect to PHI, the parties shall negotiate in good faith to amend this Addendum to remain in compliance with such regulations. Any ambiguity in this Addendum shall be resolved to permit Entity and Associate to comply with the HIPAA Rules. Nothing in this Addendum shall be construed to create any rights or remedies in any third parties or any agency relationship between the parties. A reference in this Addendum to a section in the HIPAA Rules means the section as in effect or as amended. The terms and conditions of this Addendum override and control any conflicting term or condition of the Agreement and replace and supersede any prior business associate agreements in place between the parties. All non-conflicting terms and conditions of the Agreement remain in full force and effect.

DocuSign Envelope ID: B0B35976-C4A0-415D-943C-3CF508857C2B

## SCHEDULE B

## COVERED PAYERS

**Collections by Payor**

| Payor | FY 2020 $ | FY 2020 % | YTD 11/30/2021 $ | YTD 11/30/2021 % |
|-------|-----------|-----------|------------------|------------------|
| BCBS | 3,100 | 51.4% | 3,804 | 55.6% |
| Other | 892 | 14.8% | 934 | 13.6% |
| Blue Care Network | 940 | 15.6% | 928 | 13.5% |
| Managed Medicaid | 334 | 5.5% | 322 | 4.7% |
| Self Pay | 276 | 4.6% | 308 | 4.5% |
| Aetna | 243 | 4.0% | 264 | 3.9% |
| United | 78 | 1.3% | 124 | 1.8% |
| Cigna | 20 | 0.3% | 83 | 1.2% |
| Medicare | 147 | 2.4% | 81 | 1.2% |
| **Total** | 6,029 | 100.0% | 6,847 | 100.0% |

No Material Payor, or Material Business Source plans to stop or materially decrease the amount of business done with Company and no Material Payor or Material Business Source has requested or received a decrease in the rates or prices paid to or paid by, as applicable, the Company that is inconsistent with the terms of its existing agreement with such Company.

# EXHIBIT D

## EMPLOYMENT AGREEMENT

This Employment Agreement, including the Schedules attached hereto (this "Agreement") is entered into by Company (as defined on Schedule A) and Employee (as defined on Schedule A). Collectively, Company and Employee shall be referred to as the "Parties." In consideration for the promises and covenants in this Agreement, the Parties agree as follows:

**1.    Employment.** Company agrees to employ Employee and Employee agrees to accept employment with Company as described in this Agreement. The employment relationship between Company and Employee shall commence on the Commencement Date. As of the Commencement Date (provided that Employee has commenced providing services as of such date) Employee shall be compensated in accordance with Schedule A and Company policies. Based on Employee's full-time equivalent status, Employee may be eligible to participate in benefit and 401(k) plans, and may be eligible for time off, in accordance with Schedule A and Company and its Affiliate's policies and the applicable plan documents. Company retains the right to terminate or alter any benefit or 401(k) plans or policies from time to time in Company's sole discretion.

**2.    Employee Responsibilities, Representations and Warranties.**

**2.1.  Services.**   Employee shall provide services set forth on <u>Schedule A</u> hereto (the "Services") at the facilities operated by Company (collectively, the "Facilities").

**2.2.  Compliance; Records.**   Employee shall comply with all: (a) laws, rules, accreditation agency standards and regulations applicable to the Company; (b) policies, standards, employee handbooks, rules and regulations established by Company, its Affiliates and the Facilities; and (c) agreements to which Company or its Affiliates is a party, or to which Company or its Affiliates may become a party, including without limitation, agreements with the Facilities and government payers and Third Party Payers (as defined in Section 3.8 of this Agreement).

**3.    Substance Abuse.**   Employee shall be subject to, and agrees to comply with the terms of, Company's substance abuse policies, as in effect from time to time. Employee acknowledges that the prohibitions and obligations set forth in such policies are mandatory and for the benefit of patient health and safety. Employee shall also comply with any specialty-specific or state-specific drug and alcohol testing policies and other requirements adopted by Company.

**4.    Termination.**

**4.1.  Without Cause.**   This Agreement may be terminated by either party, without cause, at any time, provided written notice of the intent to terminate is given to the other party at least sixty (60) days in advance.

**4.2.  With Cause.**   Company may terminate this Agreement for cause immediately upon notice to the Employee.

**5.    Additional Provisions.**

**5.1.      Mergers and Consolidation; Successors and Assigns.**   Employee shall not have the right to assign or delegate this personal service agreement or any of his or her rights or obligations under this Agreement. Company may enter into management service contracts with Affiliates or other third parties for the performance of non-medical services, including but not limited to billing, human resources, information technology, legal, compliance, credentialing and operations. Further, Company may freely assign and/or delegate any or all of its rights and duties under this Agreement.

**5.2.      Definition of Affiliates.**   The term "Affiliates" for purposes of this Agreement means an individual or entity (whether now existing or hereafter created) that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with Company, and each of their directors, officers, employees, and agents. For purposes of the foregoing, "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of an entity or individual, whether through the ownership of voting securities, by contract, or otherwise.

**5.3.      Entire Agreement, Construction, Modification, Waiver, Severability.**   This Agreement contains the entire understanding of the Parties and supersedes any prior or contemporaneous agreements between the Parties relating to this Agreement's subject matter. This Agreement shall not be construed against the drafting party. No modification, termination or attempted waiver of any of the provisions shall be binding unless in writing and signed by the party against whom it is sought to be enforced; provided however, that Company may, without affecting the other terms and conditions of this Agreement: (a) change the Commencement Date; or (b) modify the compensation and reimbursement terms set forth on Schedule A upon notice to Employee. Failure of a party to enforce one or more of this Agreement's provisions shall not be deemed a waiver of that party's rights under the Agreement or a party's right to enforce any provision of this Agreement. In the event that any provision of this Agreement is found to be void and unenforceable by a court of competent jurisdiction, then, to the extent permitted by applicable law, such unenforceable provision shall be deemed modified so as to be enforceable or if not subject to modification then eliminated from the Agreement, and the remaining provisions shall nevertheless continue in full force without being impaired or invalidated in any way.

**5.4.      WAIVER OF RIGHT TO JURY TRIAL.  EACH PARTY WAIVES ALL RIGHTS TO ANY TRIAL BY JURY IN ALL LITIGATION RELATING TO OR ARISING OUT OF THIS AGREEMENT OR THE RELATIONSHIP OF THE PARTIES. PROVIDER ACKNOWLEDGES THAT THIS JURY TRIAL WAIVER APPLIES TO ANY CLAIM THAT IS BROUGHT AGAINST COMPANY OR ANY OF ITS AFFILIATES.**

Executed as of the dates set forth below:

**PROVIDER:**

_Todd Rooney_
_____
Signature

Name: _____Todd Rooney_____

Date: _____2/28/2022_____

**COMPANY:**

_Adam Russo_
_____
Signature

Name: _____Adam Russo_____

Title: _____Divison President_____

Date: _3/1/2022_____

**SCHEDULE A**

**Terms and Conditions of Employment**

This Schedule A is an addendum to the Employee Employment Agreement.  In the event of any inconsistency between Schedule A and the Employment Agreement, the terms of Schedule A shall control.  Any capitalized terms not defined in Schedule A are defined in the Employment Agreement.

| | |
|---|---|
| **COMPANY NAME AND ADDRESS** | LifeStance <br><br> 20500 Eureka Rd., Suite 200 Taylor, MI 48180 USA |
| **EMPLOYEE NAME, ADDRESS, AND EMAIL** | Name: Todd Rooney <br> Address: 4863 Aljoann Rd, Brighton, MI 48116 <br> Email: tntrooney@gmail.com |
| **COMMENCEMENT DATE** | March 1, 2022 or such other date as the Company shall specify in writing. |
| **TERM** | The initial term of this Agreement shall be for one (1) year from the Commencement Date (the "Initial Term") subject to earlier termination in accordance with the Employment Agreement. After the Initial Term, this Agreement shall automatically renew for additional successive one (1) year terms (a "Renewal Term") on the same terms, conditions and provisions, unless terminated in accordance with Section 4. |
| **EMPLOYMENT STATUS** | Employee shall provide services to Company in the Facilities an average of 40 hours per week.  Employee shall be considered a full-time employee under Company's policies and benefit plans if he or she works at least 30 hours per week.  Company and Employee shall mutually agree upon any change in Employee's weekly hours. |
| **COMPENSATION** | Provider will receive an annual salary of $30,000. <br><br> Company shall pay Employee in accordance with the Company's regular payroll schedule, less required deductions for social security and Medicare tax withholdings, and income tax withholdings. Overpayments or underpayments to the clinician will be adjusted in subsequent pay periods as needed.  In order to process payroll in a timely manner, compensation calculations may be estimated from time to time.  When estimates are used adjustments will be made in the next payroll period. |
| **TIME-OFF** | Employee may take up to three weeks of paid time off per year (reduced on a pro rata basis if Employee works fewer than 40 hours), plus six Company recognized holidays per year. |
| **BENEFITS** | Employee may be eligible to participate in benefit and 401(k) plans in accordance with Company and its Affiliate's policies and the applicable plan documents. |
| **GOVERNING LAW** | Michigan |
| **RESTRICTIVE COVENANTS** | Employee shall not, during his or her employment under this Agreement and for a period of two (2) years after his or her employment under this Agreement is terminated, directly or indirectly, on his or her own behalf or as an owner, principal, partner, stockholder, officer, director, employee, agent, consultant, or independent contractor of any partnership, firm, or entity, induce or solicit or attempt to induce or solicit (i) the patients, healthcare facilities, clinics, PHOs, PPOs, HMOs, integrated delivery systems, third party payers, managed care companies, or any parties or facilities contracted with, serviced by, whether in person or via telemedicine platforms, or who have an agreement with Company or any of its Affiliates (collectively, the "Third Parties") to terminate, curtail or restrict their relationship with Company or any of its Affiliates or (ii) any person employed or contracted by Company or any of its Affiliates to leave his or her employment or contract or not to fulfill his or her contractual responsibility, or hire or engage as an independent contractor any person employed or contracted by Company or any of its Affiliates or who has been so employed or contracted by the Company or any of its Affiliates within the prior six months. <br><br> PROVIDER AND COMPANY AGREE THAT COMPANY OR ITS AFFILIATES AND THEIR RESPECTIVE SUCCESSORS OR ASSIGNS ARE AUTHORIZED TO ENFORCE THESE COVENANTS. |